Rita WILLIAMS, Plaintiff,

v.

**SHELBY COUNTY HEALTH CARE CORPORATION d/b/a Regional Medical Center at Memphis, et al., Defendants.**

No. 88–2241–TUA.

United States District Court,
W.D. Tennessee, W.D.

Sept. 23, 1992.

Donna Keene Holt, Knoxville, Tenn., for plaintiff.

Mark Norris, Charles G. Walker and J. Kimbrough Johnson, Memphis, Tenn., for defendants.

## ORDER ON PENDING MOTIONS

TURNER, District Judge.

In this medical malpractice and negligence action, the plaintiff Rita Williams seeks damages for injuries she sustained when she jumped from the second floor of the Memphis International Airport Terminal Building.

Plaintiff's action is based upon two independent theories of negligence. First, plaintiff asserts that several health care

individuals and entities [1] committed medical malpractice when they allowed her to be released from the Med without treatment after an attempted suicide. Next, plaintiff asserts that the Memphis–Shelby County Airport Authority ("Airport") was negligent in failing to take action to prevent plaintiff from injuring herself despite their knowledge that she had just been released from the Med's psychiatric unit.

Presently before the court are three separate although legally similar motions for summary judgment filed by: (1) Troy Scroggins; (2) Dana Thompson, Keith Wood, and University Physicians Foundation; and (3) the Med and Larry Hawkins. A fourth motion for summary judgment has been filed by the Airport based upon separate grounds. Plaintiff has responded and the parties have traded salvos so that the court currently has nineteen separate filings to consider.

Also before the court is plaintiff's Motion to Amend Complaint as well as a motion by defendants Hawkins and the Med to consolidate the present action with a subsequent action plaintiff filed against Delta Air Lines, Inc.[2]

### Background

On April 14, 1987, plaintiff stopped to camp overnight at Shelby Forest near Memphis. Sometime before noon April 15th she attempted to stab herself in the chest with a butcher knife. She missed. Park personnel discovered plaintiff and called the Memphis Police Department who took her to the Med for involuntary examination and psychiatric observation under *Tenn. Code Ann.* § 33–6–103.[3]

---

**1.** These defendants include: Troy Gene Scroggins, Jr., M.D.; Dana Thompson, M.D.; Keith Wood, Ph.D.; the University Physicians Foundation, Inc. ("UPF"); Shelby County Health Care Corp. d/b/a Regional Medical Center at Memphis (the "Med"); and Larry Hawkins, M.S.W. (hereinafter referred to individually by name or collectively as the "Health Care Defendants").

**2.** Plaintiff's separate action captioned *Rita Williams v. Delta Air Lines, Inc.,* No. 90–2393–TUA, was filed in this court against two other defendants. That action arises from the same facts and injuries based upon allegedly later-discovered evidence.

**3.** Section 33–6–103 provides in pertinent part:

(a) IF AND ONLY IF ... a person is mentally ill, AND ... the person poses an immediate substantial likelihood of serious harm, as defined in § 33–6–104, because of the mental illness, THEN ... the person may be detained under subsection (b) to obtain examination for certification of need for care and treatment.

(b) IF ... an officer authorized to make arrests in Tennessee ... has reason to believe that a person is subject to detention under subsection (a), THEN ... the officer or physician may take the person into custody without

At that time Dr. Scroggins, a medical doctor at the University of Tennessee Medical School in its residency program,[4] was on duty in the emergency room of the Med. He took a medical history and performed a physical examination. During his examination of plaintiff, she told him "God stopped me." Finding no wounds, Dr. Scroggins referred plaintiff to the psychiatric section for evaluation and disposition.

Dana Thompson, a third-year medical student at the University of Tennessee Medical School assigned to the Med on a two-month psychiatric rotation, interviewed plaintiff at length. Thompson diagnosed plaintiff as having a borderline personality disorder and recommended she seek outpatient psychiatric treatment at home in South Carolina. Dr. Keith Wood, Ph.D., the supervising psychologist working in the emergency room examined plaintiff, verified Thompson's diagnosis, and then endorsed Thompson's findings and recommended outpatient treatment.[5] No finding was made that there was a substantial

likelihood that serious harm would occur unless plaintiff was placed under involuntary treatment. Thompson called plaintiff's uncle and began making arrangements for getting her home so she could receive outpatient care with the assistance of family.

Thereafter, Larry Hawkins, a medical social worker on the staff at the Med, assisted plaintiff in making arrangements to get from Memphis to South Carolina. Hawkins made reservations for an 8:25 p.m. flight on Delta Air Lines and called her uncle to arrange for payment. He also arranged for plaintiff's transfer to the airport by taxi.

At about 6:50 p.m., plaintiff was discharged from the Med and put into a taxi for transportation to the airport. She arrived at the Delta ticket counter just as her flight was departing the gate.[6] The Delta agents rebooked her for a 6:00 a.m. flight the next day. Because she appeared to be confused, they called the Airport Police for

---

a civil order or warrant for immediate examination under subsection (d) for certification of need for care and treatment.

(c) IF AND ONLY IF ... a person is mentally ill, AND ... the person poses an immediate substantial likelihood of serious harm, as defined in § 33–6–104, because of the mental illness, AND ... the person needs care, training, or treatment because of the mental illness, AND ... all available less drastic alternatives to placement in a hospital or treatment resource are unsuitable to meet the needs of the person, THEN ... the person may be admitted and detained by a hospital or treatment resource for emergency diagnosis, evaluation, and treatment under this section.

(d) IF ... a licensed physician takes a person into custody under this section, OR ... a person is brought to such a physician for examination under this section, THEN ... the physician shall immediately examine the person and decide whether the person is subject to admission to a hospital or treatment resource under subsection (c), AND ... IF ... the person is not subject to admission, THEN ... the physician shall release the person, AND ... IF ... the person is subject to admission, THEN ... the physician shall complete a certificate of need for such emergency diagnosis, evaluation, and treatment showing the factual foundation for the conclusions on each item of subsection (c).

*Tenn.Code Ann.* § 33–6–103(a–d) (1984).

"Substantial likelihood of serious harm" is defined in *Tenn.Code Ann.* § 33–6–104 as:

(a) IF AND ONLY IF ... a person has threatened or attempted suicide or to inflict serious bodily harm on himself, ... AND ... there is a substantial likelihood that such harm will occur unless the person is placed under involuntary treatment, THEN ... the person poses a "substantial likelihood of serious harm" for purposes of § 33–6–103 and this section.

**4.** Dr. Scroggins' affidavit states he was "an intern physician in internal medicine" at the University; an affidavit from a dean of the College of Medicine at the University states that Dr. Scroggins was employed "in the residency training program...."

**5.** Dr. Wood was an assistant professor of psychiatry at the College of Medicine, University of Tennessee, Memphis and also a member of UPF, a private physicians association consisting of members of the University of Tennessee faculty. UPF had apparently contracted with the Med to provide the services of some of its members. In her complaint, plaintiff alleged Dr. Wood was acting in his capacity as a member of UPF when he "signed off" on Dr. Thompson's diagnosis and not as a staff member of the University of Tennessee College of Medicine.

**6.** Plaintiff alleges she was raped by the cab driver who then delivered her to the airport late for her flight.

assistance. Officer Bonnie Bevel was dispatched to the scene. After observing plaintiff's behavior, Officer Bevel asked the agent to arrange to have plaintiff taken back to the Med overnight. The Delta agent called the Med and spoke with a Dr. Gentry who stated that plaintiff would not be a danger to anyone and that they should just treat her as they would any other stranded passenger. Sometime later, Mr. Hawkins learned from Dr. Gentry that plaintiff had missed her flight.

At some point a Delta agent also called plaintiff's uncle in South Carolina to inform him that plaintiff had missed her flight and would be arriving the next day. Officer Bevel then took the plaintiff to a quiet area in the terminal and persuaded her to get some sleep. Officer Bevel checked on plaintiff periodically. At about 4:00 a.m. she noticed that plaintiff had gotten up, appeared agitated, and was pacing around in the terminal lobby. Officer Bevel stayed some distance from plaintiff and called her supervisor to discuss what they should do. While Officer Bevel spoke with her supervisor, plaintiff bolted out the doors and jumped head first over the second floor railing. Plaintiff was severely injured. She was transported to the Med for treatment of her injuries.

### Procedural Background

Plaintiff filed this action on April 1, 1988. The initial scheduling order filed pursuant to *Fed.R.Civ.P.* 16(b) provided for completion of discovery before March 18, 1989. In March of 1989, by agreement of the parties, the court extended the time for discovery to October 15, 1989.

On June 22, 1988, defendant Scroggins moved for summary judgment asserting absolute immunity under *Tenn.Code Ann.*

§ 9–8–307.[7] By stipulation filed July 27, 1988, defendant's motion was stayed until additional discovery could be completed.

On August 4, 1988, defendants Wood, Thompson, and UPF, submitted interrogatories to plaintiff pursuant to *Fed.R.Civ.P.* 26(b)(4)(A)(i) asking her to identify any expert witness she expected to call at trial. In her response on February 15, 1989, plaintiff stated "Plaintiff has not determined at this time who will be called as an expert witness at the trial of her case. When that determination is made, plaintiff will supplement this interrogatory response."

At some point prior to the October discovery deadline, the parties apparently agreed among themselves that discovery might be extended to April 15, 1990. A signed agreement was forwarded to plaintiff for signature and filing; however, no agreement to that effect was forwarded to the court nor was an appropriate order requested of or entered by the court.

On June 22, 1990, eight months after the time for discovery had ended, defendants Hawkins and the Med moved for summary judgment. Similar motions for summary judgment were filed by defendant Scroggins on July 13, 1990, and by defendants Wood, Thompson and UPF on August 6, 1990. Each of these motions was based upon defendants' assertion that contrary to defendants' ongoing interrogatory discovery request, plaintiff had failed to disclose the name of the expert medical witness who would provide required medical testimony in compliance with *Tenn.Code Ann.* § 29–26–115 (1980). *See Fed.R.Civ.P.* 26(e)(1)(B).[8]

Plaintiff responded by moving to stay the hearing on the defendants' motions for

---

7. Section 9–8–307 provides that the Tennessee Claims Commission "shall have exclusive jurisdiction to determine all monetary claims against the state" for the "[n]egligent care, custody and control of persons." *Tenn.Code Ann.* § 9–8–307(a)(1)(E) (1987). Subsection (h) further provides that state employees are absolutely immune from suit when acting within the scope of their state employment. *Id.* § 9–8–307(h). To recover for negligently caused inju-

ries, the claimant must file a claim with the state.

8. *Fed.R.Civ.P.* 26(e)(1)(B) requires a party "seasonably to supplement [a discovery] response with respect to any question directly addressed to ... the identity of each person expected to be called as an expert witness at trial...." It does not appear that plaintiff complied with this requirement prior to or even subsequent to expiration of the discovery deadline.

**1310**

summary judgment pursuant to *Fed. R.Civ.P.* 56(f). By order of this court filed on September 28, 1990, plaintiff's motion was denied and she was directed to respond to defendants' motions.

Plaintiff's response filed on October 18, 1990, was supported by the affidavit of Dr. Thomas Kitts, M.D., a specialist in Emergency Medicine. Dr. Kitts' affidavit was dated October 17, 1990, nearly one year after expiration of the discovery deadline. Plaintiff also renewed her Rule 56(f) motion and requested that discovery be reopened. The court denied this motion on March 18, 1991, finding the reasons cited for plaintiff's untimeliness still to be unconvincing. Moreover, the court found that plaintiff had not identified any specific discovery deemed necessary for extension of the deadline. The court directed plaintiff to identify what specific facts plaintiff needed in order to respond to defendants' motions.

Plaintiff filed a tardy response on April 22, 1991. On July 1, 1991, the court denied plaintiff's renewed motion to stay consideration of defendants' motions for summary judgment and enlarge the time for discovery finding that plaintiff had failed to show good cause for a modification of the extended scheduling order. The court found, inter alia, that plaintiff's explanation that her Tennessee counsel had been involved in extremely complex litigation (which began at or near the October 1989 discovery deadline) did not provide sufficient explanation as to why both plaintiff's Tennessee *and* South Carolina counsel had failed to meet the discovery deadline.

On February 6, 1991, defendant Airport filed a separate and unrelated motion for summary judgment asserting that Officer Bevel's attempts to assist plaintiff constituted the exercise of a discretionary function and afforded the Airport immunity from suit under the Tennessee Governmental Tort Liability Act, *Tenn.Code Ann.* § 29–20–201 et seq.

### Dr. Scroggins—Immunity under *Tenn.Code Ann.* § 9–8–307

■ Dr. Scroggins originally filed a motion for summary judgment on June 22, 1988 asserting immunity from suit under *Tenn.Code Ann.* § 9–8–307(h).[9] Defendant's motion was supported by the affidavit of a Dean of the College of Medicine of the University of Tennessee, Memphis asserting that defendant was enrolled in the medical school's residency program and employed full-time by the University of Tennessee. As noted, consideration of this summary judgment motion was stayed by stipulation pending further discovery.

In a Supplemental Memorandum filed November 1, 1990, Dr. Scroggins submitted an affidavit averring that "At all times and for all purposes pertinent to this action, I acted solely within the scope of my employment as an employee of the University of Tennessee."

On its face, this would seem to bring plaintiff's allegations against this defendant under the purview of section 9–8–307(h). *See Thompson v. Regional Medical Center at Memphis,* 748 F.Supp. 575 (W.D.Tenn.1990). Plaintiff, however, contends such immunity is inapplicable under the terms of the statute because Dr. Scroggins's actions were "criminal acts or omissions" outside the scope of defendant's employment, and therefore not subject to immunity. In this regard, plaintiff points out that nowhere does Dr. Scroggins indicate he was licensed to practice medicine in Tennessee at the time. Tennessee law provides that medical interns and residents who are not licensed to practice medicine in Tennessee may only perform duties assigned under an AMA approved training program "while under the supervision and control of a physician licensed to practice medicine in Tennessee." *See Tenn.Code Ann.* § 63–6–201(b)(1) (1990). Failure to comply with this provision subjects the of-

---

9. At the time the action was filed, that section provided in pertinent part:

    (h) State officers and employees are absolutely immune from liability for acts or omissions within the scope of the officer's or em-

ployee's office or employment, except for willful, malicious, or criminal acts or omissions or for acts or omissions done for personal gain....

*Tenn.Code Ann.* § 9–8–307(h) (1987).

fending resident or intern to misdemeanor criminal penalties. *Tenn.Code Ann.* § 63-6-203 (1990) (class B misdemeanor punishable by fine).

Dr. Scroggins' affidavits do not show that he was duly licensed in Tennessee or that he was under the direct supervision, and control of a Tennessee-licensed physician when he examined plaintiff and referred her for psychiatric evaluation. Absent such a showing, Dr. Scroggins' original motion for summary judgment must fail.

As noted in the procedural discussion above, however, this defendant filed a second motion for summary judgment on July 13, 1990 asserting the same basis as defendants Hawkins and the Med. The court construes such motion as asserting an alternative basis for summary judgment.

### Plaintiff's Failure to Timely Specify Her Expert Witnesses

█ In their motions for summary judgment, the Health Care Defendants first contend that by failing to timely identify an expert witness, as required by Rule 26(e)(1)(B), plaintiff will be unable to sustain her burden of proof at trial under *Tenn.Code Ann.* § 29–26–115.[10] *See Ferrara v. Balistreri & DiMaio, Inc.*, 105 F.R.D. 147 (D.Mass.1985) (party is under a continuing obligation to supplement interrogatory requesting identification of expert witness to be called at trial).

In response to defendants' motions, plaintiff has filed the affidavits of three experts, the earliest of which is dated October 17, 1990. *See* affidavits of Dr. Thomas Kitts, M.D., executed October 17, 1990 and July 26, 1991, filed October 18, 1990 and August 1, 1991 respectively; affidavit of Calvin Keith Hulse, Ph.D. Psychology, executed January 10, 1991, filed February 7, 1991; and affidavit of Dr. Charles R. Herlihy, M.D., executed July 29, 1991, filed August 1, 1991. Such affidavits may be sufficient to defeat a motion for summary judgment. *See Bowman v. Henard*, 547 S.W.2d 527 (Tenn.1977). However, the affidavits are not in and of themselves competent evidence at the trial itself.

By their motion, defendants implicitly request that the court sanction plaintiff for her failure to designate an expert witness prior to expiration of the discovery deadline by excluding plaintiff's expert witness testimony. Here, because of the statutory requirement of expert testimony, the exclusion of such testimony would amount to a dismissal of the action.

Exclusion of testimony is a severe sanction and "should be imposed with care and only when necessary to vindicate the Court's Orders and its authority to insist that they be obeyed." *Ferrara v. Balistreri & DiMaio, Inc.*, 105 F.R.D. at 151. In *Murphy v. Magnolia Electric Power Ass'n*, 639 F.2d 232 (5th Cir.1981), the court set forth several factors a trial court should consider in making such a determination. The court stated:

> Exclusion of evidence in some instances is an appropriate sanction for [failure to supplement interrogatory answers], *see* Advisory Committee Note to Rule 26(e), and the district judge enjoys considerable discretion in determining when it is properly imposed, *see Washington Hospital Center v. Cheeks*, 394 F.2d 964, 965 (D.C.Cir.1968) (Burger, J.). Among the factors which the court should take into consideration in determining whether to exclude evidence are "the explanation, if any, for the failure to name the witness, the importance of the testimony of the witness, the need for time to prepare to meet the testimony, and the possibility of

---

**10.** *Tenn.Code Ann.* § 29–26–115(a) (1980) provides in pertinent part:

> In a malpractice action, the claimant shall have the burden of proving by evidence ...:
>
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time

the alleged injury or wrongful action occurred;

> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

a continuance." 8 C. Wright & A. Miller, Federal Practice and Procedure, § 2050 at 327 (1970).

639 F.2d at 234–35.

■ The Advisory Committee Notes evince a concern that the parties not be subjected to the surprise created by a party designating such a witness at or near the time of trial thereby precluding meaningful discovery of the expert's testimony. *See* Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, Advisory Committee Notes, 48 F.R.D. 487, 503–04, 508 (1970). *See also Schearbrook Land and Livestock Co. v. United States*, 124 F.R.D. 221, 223 (M.D.Fla.1988). Where, as here, trial has not been scheduled, the main impetus behind the rule is not as strongly implicated. Absent such a compelling factor, the offending party's conduct must rise to a level where it is tantamount to a deliberate or fraudulent non-disclosure. *See Bemer Aviation, Inc. v. Hughes Helicopter, Inc.*, 621 F.Supp. 290, 302 (E.D.Pa.1985) (quoting *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)).

Even when viewed in its worst light, plaintiff's failure to timely answer defendants' interrogatory concerning the identity of plaintiff's experts appears to have been the result of neglect rather than intentional or fraudulent design. It is also significant that at no time did defendants move to compel plaintiff's answer to this interrogatory nor did they move for designation of plaintiff's expert witnesses. *Cf. Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1549 (Fed.Cir. 1984) (motion to compel answers to interrogatories filed prior to expiration of discovery); *Schearbrook Land and Livestock Co. v. United States*, 124 F.R.D. 221, 222 (M.D.Fla.1988) (in limine motion to exclude testimony filed three months prior to scheduled trial date). Such a motion would undoubtedly have been granted and would have imposed on plaintiff a deadline for the identification of her experts.

On the other hand, plaintiff cannot be heard to complain too loudly inasmuch as the first time plaintiff "specified" the identity of a medical expert was when she filed the affidavit of Dr. Kitts on October 18, 1990, over one year after the discovery deadline had expired. Subsequent "specifications" by submission of affidavits were piecemeal and protracted. Moreover, no explanation has ever been provided as to why plaintiff's South Carolina counsel was unable to fulfill plaintiff's discovery commitments. In its order of July 1, 1991, the court denied plaintiff's motion to extend discovery under Rule 56(f) or to enlarge the time for discovery because plaintiff failed to adequately explain her dilatory behavior. Notwithstanding the fact that plaintiff's counsel were derelict through their dilatory behavior and the substantial amount of time that has elapsed since the close of discovery, the court will exercise its discretion and consider the affidavits proffered by plaintiff.[11]

### *Summary Judgment—Health Care Defendants*

■ The Health Care Defendants next contend that plaintiff has failed to submit evidence that is sufficient to meet her statutorily imposed burden for proof of medical malpractice. Additionally, they contend that plaintiff's allegations that she was raped by a cab driver and that the Airport failed to properly supervise plaintiff once they had accepted responsibility constitute unforeseeable, independent, intervening causes of plaintiff's injuries. Because of substantial dissimilarities in the analysis of plaintiff's claim against Larry Hawkins, the court will discuss his summary judgment motion separately.

On a motion for summary judgment, the movant has the initial burden of demonstrating that there are no genuine issues of

---

**11.** This action has been pending over 4 years. In the last two years, plaintiff has provided the affidavits of 3 experts; no other experts have been identified in response to the interrogatory asking for such information. Under these circumstances, it is only reasonable and fair that plaintiff's proof at trial should be limited to the three experts now identified and that is the court's intent.

material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Upon considering such a motion, the court's function is not to weigh the evidence or judge its truth, rather, the court must determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, all reasonable inferences are drawn in favor of the non-moving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In a medical malpractice action brought pursuant to *Tenn.Code Ann.* § 29–26–115, the plaintiff must prove the applicable standard of care, a violation of that standard, and a causal connection between the breach and plaintiff's injury. *See Bowman v. Henard,* 547 S.W.2d 527 (Tenn.1977); *Stokes v. Leung,* 651 S.W.2d 704 (Tenn.Ct.App. 1982). In support of their motions for summary judgment, defendants have submitted the affidavits of Drs. Dana Thompson, M.D. and Keith Wood, Ph.D. stating that they fully complied with the applicable standard of care for examination and disposition of mental health problems. Additionally, in his affidavit, Dr. Troy Gene Scroggins, Jr., M.D., states that he examined the plaintiff and after finding no physical injuries, referred her to the psychiatric ward of the emergency room at the Med for further disposition.

Plaintiff's expert, Dr. Charles E. Herlihy, M.D., states in his countervailing affidavit that he is aware of the applicable standard for the care and treatment of psychiatric patients by physicians and other mental health professionals and that the defendants' "failure to detect and properly treat [plaintiff's] condition represents a breach of the standard of care owed [to her] by all defendants." Dr. Thomas Kitts, M.D., an emergency room physician familiar with the standard of care for emergency room physicians, mental health workers, and hospitals regarding the treatment of psychiatric patients, states in his affidavit that as the emergency room physician, Dr. Scroggins had a duty to review the findings, proposed disposition, and rationale of Drs.

Thompson and Wood. He states that Dr. Scroggins' failure to review such findings was a breach of Dr. Scroggins' standard of care. He further opines that Drs. Thompson and Wood breached the emergency room standard of care by failing to report their recommendations to a licensed staff emergency physician.

Viewing the evidence in the record in the light most favorable to the non-movant, with all reasonable inferences drawn in her favor as required by *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., supra,* the court finds that plaintiff has sufficiently controverted the evidence of the medical defendants to overcome their motions for summary judgment on this issue.

As to the defendants' assertion that the alleged rape and the Airport's alleged breach of duty constitute unforeseeable, independent intervening causes, the facts contained in this record leave no question that this material fact issue is controverted. Thus, summary judgment is inappropriate at this time.

### *Summary Judgment—Larry Hawkins*

■ Plaintiff's complaint also alleges malpractice by the Med's employee, medical social worker Larry Hawkins. However, the uncontroverted facts in the record indicate that plaintiff was brought to the Med for evaluation and possible involuntary admission under *Tenn.Code Ann.* § 33–6–103. Furthermore, pursuant to § 33–6–103(f) a licensed clinical psychologist determined that plaintiff was not to be admitted to the Med. Plaintiff has presented absolutely no proof that the standard of care for a medical social worker requires that a social worker in some way force a doctor to reassess his decision not to commit based upon facts extraneous to a patient's medical condition.

While it is true that Hawkins helped make the arrangements for plaintiff to fly home, plaintiff left the hospital unescorted after being examined and released by a licensed clinical psychologist. Mr. Hawkins learned from a Dr. Gentry that plain-

tiff had missed her plane and that her uncle wanted her to come back to the hospital, but that Dr. Gentry had told the uncle that there was no provision to bring her back. Even with all inferences favorable to plaintiff, there is no basis for plaintiff's claim against Hawkins. Hawkins was not a doctor and it was not his responsibility to second guess the physicians and other medical personnel of the hospital. There is no evidence that he performed his medical social work in a negligent fashion, nor that his conduct proximately resulted in plaintiff's injuries. Defendant Hawkins is therefore granted summary judgment.

### Summary Judgment—Airport

In her complaint, plaintiff alleged that the Airport through Officer Bevel's actions assumed a duty to closely observe and control plaintiff. Despite assuming such duty, Officer Bevel allegedly failed to inform appropriate authorities of plaintiff's condition and failed to watch plaintiff closely enough. Specifically, plaintiff contends that despite knowledge of plaintiff's psychiatric condition, the officer did not take adequate steps to prevent plaintiff from hurting herself.

In its motion for summary judgment, the Airport claims that as a governmental entity, its actions and those of its employees are subject to the limitations of the Tennessee Governmental Tort Liability Act ("GTLA"). The Airport alleges that *Tenn. Code Ann.* § 33-6-103 [12] defines the parameters within which the officer was required to act to justify involuntarily taking plaintiff into protective custody for psychiatric evaluation and treatment. Defendant contends such evaluation by the officer was subjective and therefore "discretionary" rather than "ministerial." Thus, defendant argues, the officer's actions fall within the "discretionary function" excep-

tion of the GTLA, *Tenn. Code Ann.* § 29-20-205(1).[13]

In *Bowers v. City of Chattanooga*, 826 S.W.2d 427 (Tenn.1992), the Tennessee Supreme Court redefined the term "discretionary function" as used in the GTLA. Prior to *Bowers*, the Tennessee courts had applied the Tennessee common law definition:

Where the duty is absolute, certain, and imperative, and is simply ministerial, the officer is liable in damages to any one specially injured, either by his omitting to perform the task or by performing it negligently or unskillfully. On the other hand, where his powers are discretionary, and to be exerted or withheld according to his own judgment, he is not liable to any private person for a neglect to exercise those powers, nor for the consequences of a willful exercise of them, where no corruption or malice can be imputed to him, and he keeps within the scope of his authority.

*Hale v. Johnston*, 140 Tenn. 182, 197, 203 S.W. 949, 953 (1918).

In *Bowers*, a route planner for the school bus system changed the bus routes and drivers that served plaintiff's stop due to overcrowding on the bus that previously served the stop. On the first day the new route was used, plaintiff, a six-year-old child, was struck by a car shortly after he had disembarked from the school bus.

The stop itself was located at the corner of a busy multi-lane divided street and a residential crossing street. Previously, the bus had always made two stops. The bus would first stop on the multi-lane street in order to stop all traffic and allow children living on the other side to safely cross. The bus would then pull around the corner and stop on the residential street and discharge the remaining passengers. On this day, however, the new driver turned onto the residential street, stopped, and dis-

---

**12.** *See supra* note 3 for text of this section.

**13.** *Tenn. Code Ann.* § 29-20-205(1) (1980) provides:

Immunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any

employee within the scope of his employment except if the injury:

(1) Arises out of the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused....

charged all the children. Without the protection of the school bus on the multi-lane street, plaintiff ran out and was struck by a passing automobile.

The trial court found that the bus driver's duty did not arise out of a discretionary function, found that the driver was negligent, and awarded the child and his parents judgment. The Court of Appeals reversed holding that the cause of the injury was the change in the routes precipitated by the route planner's actions. Such actions were discretionary functions immune from suit.

Finding the distinctions between the discretionary/ministerial and governmental/proprietary functions to be "imprecise," and prone to inconsistent decisions, the Tennessee Supreme Court approved the approach used by many state and federal courts. That approach requires the court to determine whether the complained of acts were performed at the "planning" level or at the "operational" level. The court stated:

> Under the planning-operational test, decisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability, while decisions that are merely operational are not considered discretionary acts and, therefore, do not give rise to immunity. *See Carlson v. State,* 598 P.2d 969, 972 (Alaska 1979). The distinction between planning and operational depends on the type decision rather than merely the identity of the decision maker. *See id.* ...

> Under the planning-operational test, discretionary function immunity does not automatically attach to all acts involving choice or judgment. Such an analysis recognizes that, to some extent, every act involves discretion. Rather, the underlying policy of governmental immunity is better served by examining (1) the decision-making process and (2) the propriety of judicial review of the resulting decision. *Cf. Peavler [v. Board of Commissioners of Monroe County ],* 528 N.E.2d [40] at 46 [ (Ind.1988) ] (examining the nature of the conduct, its effect on governmental operations, and the capacity of a court to evaluate the decision).

> A consideration of the decision-making process, as well as the factors influencing a particular decision, will often reveal whether that decision is to be viewed as planning or operational. If a particular course of conduct is determined after consideration or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision. These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications, or schedules. *See id.*

> On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act. Similarly operational are those ad hoc decisions made by an individual or group not charged with the development of plans or policies. These operational acts, which often implement prior planning decisions, are not "discretionary functions" within the meaning of the Tennessee Governmental Tort Liability Act. In other words, "the discretionary function exception [will] not apply to a claim that government employees failed to comply with regulations or policies designed to guide their actions in a particular situation." *Aslakson v. United States,* 790 F.2d 688, 692 (8th Cir.1986).

*Bowers,* 826 S.W.2d at 430–31.

The court found that the decision to change the bus stop from one route to another "was a planning/policy decision of the type intended to be immune from judicial challenge" under discretionary function immunity. *Id.* at 432. However, the court also noted that where there is a clear plan and policy existent, a decision left to an employee concerning how to implement such policy "is an operational act not within the discretionary function to governmental immunity." *Id.* Inasmuch as the bus driver had a clearly defined duty to protect his minor charges, his selection of the actual stopping point was an operational act

rather than one involving "planning." Thus, his actions were subject to normal negligence analysis.

The Airport's analysis of discretionary immunity embraces the pre-*Bowers* common law application rather than the analytical framework set forth by the Tennessee Supreme Court in *Bowers*.[14] Under *Bowers*, Officer Bevel's actions are not subject to blanket categorization as immune from suit simply because they involved the subjective use of discretion on her part.

Because the *Bowers* opinion raises issues distinct from those under pre-*Bowers* law which involve a factual analysis that has not been made by the defendant, the motion as filed is not well taken. The motion is therefore denied without prejudice to its refiling within 30 days if, in the opinion of defendant, there are undisputed facts which compel a conclusion that the Airport's actions are entitled to immunity under the *Bowers'* standard.

### Motion to Consolidate

On June 7, 1991, defendants Hawkins and the Med filed a Motion to Consolidate this action with an action filed by plaintiff in 1990, captioned *Rita Williams v. Delta Air Lines, Inc. and Dr. Gentry*, No. 90–2393–TUA. Plaintiff's 1990 action was based upon precisely the same facts and involved substantially similar questions of law as the instant case.

However, that case was subsequently closed, inasmuch as Delta Airlines was granted summary judgment based upon expiration of the applicable limitation period and the other defendant was never served and has been dismissed. Under these circumstances, consolidation is moot. Defendants' motion to consolidate is therefore denied.

### Motion to Amend Complaint

■ Finally, on December 20, 1991, more than two and one-half years after the Rule 16 cutoff for amending pleadings, plaintiff moved to amend her complaint to state a claim against the Med under the Federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd. Citing Rule 15(a) of the Federal Rules of Civil Procedure which provides that the court shall freely grant leave to amend, plaintiff contends that her original complaint states sufficient facts upon which such a claim could be based and for which the Med was provided notice.

Plaintiff's proposed amendment draws into issue a wholly different factual standard than that required for establishing medical malpractice. A claim under the Federal Emergency Medical Treatment and Active Labor Act would require proof that the hospital failed to give plaintiff the same "screening that the hospital would have offered to any paying patient" *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir.1990). Plaintiff has never claimed that she was screened any differently than any paying patient. To inject such an issue at this late date would be unreasonable and prejudicial to the Med and require it to establish facts that are over five years old.

Plaintiff's motion to amend its complaint to assert a claim under the Federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd is denied.

In summary, defendant Hawkins' motion for summary judgment is granted. All other defendants' motions for summary judgment are denied. Defendants Hawkins and the Med's motion to consolidate is denied as moot. Plaintiff's motion to amend is denied.

IT IS SO ORDERED.

14. The Airport's motion was prepared and filed the year before the Supreme Court's decision in *Bowers.*