Danny Leon BOWERS, a minor by Next Friend Danny BOWERS and Carmen Hudgens, and Danny Bowers and Carmen Hudgens, individually, Plaintiffs–Appellants,

v.

CITY OF CHATTANOOGA, Brett A. Newmyer and John Newmyer, Defendants–Appellees.

Supreme Court of Tennessee, at Knoxville.

Feb. 18, 1992.

428

Stephen T. Greer, Greer & Smith, Dunlap, Charles D. Paty, Paty, Rymer & Ulin, Chattanooga, for plaintiffs-appellants.Stephen T. Greer, Greer & Smith, Dunlap, Charles D. Paty, Paty, Rymer & Ulin, Chattanooga, for plaintiffs-appellants.

Randall L. Nelson, William Shelley Parker, Jr., Phillip A. Noblett, Chattanooga, for defendants-appellees.

## OPINION

DROWOTA, Justice.

In this personal injury action, brought under the Tennessee Governmental Tort Liability Act, we granted Plaintiffs' application for permission to appeal in order to determine the sole issue of whether T.C.A. § 29–20–205(1) (1980) protects the defendant City of Chattanooga from a suit alleging negligence on the part of a public school bus driver. The minor plaintiff Danny Leon Bowers, his mother, and his father, brought suit to recover for injuries sustained when he was struck by an automobile shortly after departing from a Chattanooga Public School bus. The trial court, finding that the bus driver's negligence did not arise out of the performance of a discretionary function, returned a judgment for the minor plaintiff, his mother, and his father, in the amounts of $100,000.00, $5,000.00, and $30,000.00, respectively. On appeal, the intermediate court dismissed the action, holding that any negligence attributable to the City arose from discretionary acts protected by section 29–20–205(1) of the Tennessee Governmental Tort Liability Act.

Six-year-old Danny Bowers, who was in the first grade of the Chattanooga Public School System, was injured on September 9, 1986, when he was struck by an automobile as he attempted to cross Dodds Avenue shortly after disembarking from a school bus owned and operated by the Chattanooga Public School System. The automobile that struck Danny Bowers was driven by Brett A. Newmyer and owned by John Newmyer. The Newmyers were originally named as defendants in this case; they and the Plaintiffs have entered into a settlement agreement.

Dodds Avenue is a congested four-lane street in central Chattanooga that runs north to south. Pro Re Bona Day Care Center is located in the northwest quadrant of the intersection of Dodds Avenue and 18th Street; 18th is a stop street which crosses Dodds in an east-west direction. There are no traffic controls for Dodds Avenue traffic at 18th. The entrance to Pro Re Bona is located on the 18th Street side of the building. In 1980 or 1981, the Transportation Division of the Chattanooga Public School System established a school bus stop at the day care center.

Danny Bowers lived with his mother and grandmother on the east side of Dodds Avenue, across the street from the day care center. Throughout his 1985–86 kindergarten school year, and for approximately the first four weeks of the 1986–87 school year, Danny Bowers rode a public school bus, getting on and off at the Pro Re Bona stop.

Every school day prior to the day of the accident, Danny Bowers was accompanied to and from the bus stop by his mother or grandmother. They would walk him across Dodds Avenue in the morning (going from east to west across Dodds Avenue), meet him in the afternoon, and accompany him back (going from west to east).

Some children who utilized the Pro Re Bona bus stop went to the day care center; others simply lived in the neighborhood. Of these neighborhood children, as many as eight to twelve, ranging from five to twelve years in age, were required to cross Dodds Avenue in order to reach their homes.

The bus route, established by the Chattanooga School System Transportation Division, did not designate precisely where the bus was to stop, only that its stop was the "Pro Re Bona Nursery." While this stop was originally established to serve only the nursery, stopping at its 18th Street entrance, the trial court found that through the years the bus stopped at different locations at and around the day care center. During the year of the accident, with only one exception, the afternoon bus had made two stops at this location: first, on Dodds Avenue to let off the children who crossed Dodds going east; second, around the corner at the 18th Street entrance to the day care center. At both locations, the bus stopped traffic (with its stop sign and warning lights) until the students had crossed the particular street.

On the day of the accident, September 9, 1986, a change was made in the bus schedule. Because of overcrowded conditions, the School System's Transportation Department decided that the children who normally disembarked at the Pro Re Bona bus stop would ride a different bus with a different driver. Under this new schedule, the bus carrying Danny arrived at the day care center approximately ten minutes earlier than under the old schedule.

On September 9, the bus did not stop on Dodds Avenue, but only at the 18th Street entrance to the day care center. Danny got off the bus there and began walking east towards Dodds Avenue. Because of the bus's earlier arrival (of which Danny's mother had no prior notice), his mother did not meet him on the west side of Dodds. She had just arrived at the east side of Dodds Avenue when Danny began crossing Dodds with other students. She unsuccessfully tried to tell him to wait, but Danny attempted to cross Dodds and was hit by the car driven by Brett Newmyer.

In order for Plaintiffs to recover (1) the Court must determine that the City of Chattanooga is not immune from suit, and (2) plaintiffs must prove the necessary elements of negligence.

As stated earlier, the trial court found that the accident did not arise out of a "discretionary function" and therefore the City was not immune from suit. Specifically, the trial court found the bus driver negligent in failing to stop on Dodds, and thus provide protection for the children who needed to cross that avenue. This negligent act was determined not to be a discretionary function.

The Court of Appeals reversed, finding the City immune from suit. This finding was based largely upon a different factual conclusion regarding the cause of the accident. The Court of Appeals found it was "the change in schedule" which placed the minor Plaintiff in a position of peril. This altering of bus routes and schedules was found to be a "discretionary function," thus conferring immunity upon the City.

I.

■ With respect to the threshold issue of immunity, section 29–20–205 of the Tennessee Governmental Tort Liability Act (the "Act") provides in part:

*Immunity* from suit of all governmental entities *is removed* for injury proximately caused by a negligent act or omission of any employee within the scope of his employment *except if* the injury:

(1) Arises out of the exercise or performance or the failure to exercise or perform a *discretionary function,* whether or not the discretion is abused. (emphasis added).

While the Act does not define "discretionary function," this Court has repeatedly applied the following common law definition:

Where the duty is absolute, certain, and imperative, and is simply ministerial, the officer is liable in damages to any one specially injured, either by his omitting to perform the task or by performing it negligently or unskillfully. On the other hand, where his powers are discretionary, and to be exerted or withheld according to his own judgment, he is not liable to any private person for a neglect to exercise those powers, nor for the consequences of a willful exercise of

them, where no corruption or malice can be imputed to him, and he keeps within the scope of his authority.

*Hale v. Johnston,* 140 Tenn. 182, 197, 203 S.W. 949, 953, (1918).

We find that time has come to provide more guidance with respect to which activities are within the scope of the "discretionary function" exception and to abandon attempts to construe the exception solely by reference to the literal definitions of "discretionary" and "ministerial." The classification of functions as governmental/proprietary or discretionary/ministerial is imprecise, does not draw a clear and definite distinction, and leads to inconsistent results. Today we approve of the analysis that determines which acts are entitled to immunity by distinguishing those performed at the "planning" level from those performed at the "operational" level. As Chief Justice Shepard of Indiana said in *Peavler v. Board of Commissioners,* 528 N.E.2d 40, 45 (Ind.1988):

The distinction between planning and operational functions is a standard, rather than a precise rule. The focus must remain on the policy underlying governmental immunity. If the act is one committed to coordinate branches of the government involving policy decisions not reviewable under traditional tort standards of reasonableness, the government is immune from liability even if the act was performed negligently.

In adopting the "planning-operational" test which was urged by Judge Franks's dissent in *Davis v. City of Cleveland,* 709 S.W.2d 613, 616 (Tenn.App.1986), we overrule *Hale* and its progeny to the extent that this test conflicts with the definitions set forth in *Hale.*

■ Under the planning-operational test, decisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability, while decisions that are merely operational are not considered discretionary acts and, therefore, do not give rise to immunity. *See Carlson v. State,* 598 P.2d 969, 972 (Alaska 1979). The distinction between planning and operational depends on

the type of decision rather than merely the identity of the decision maker. *See id.* We caution that this distinction serves only to aid in determining when discretionary function immunity applies; discretionary function immunity attaches to all conduct properly involving the balancing of policy considerations. Therefore, there may be occasions where an "operational act" is entitled to immunity, where, for instance, the operational actor is properly charged with balancing policy considerations. *See United States v. Gaubert*, 499 U.S. ——, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (recognizing that operational activities grounded in policy are entitled to discretionary function immunity).

■ Under the planning-operational test, discretionary function immunity does not automatically attach to all acts involving choice or judgment. Such an analysis recognizes that, to some extent, every act involves discretion. Rather, the underlying policy of governmental immunity is better served by examining (1) the decision-making process and (2) the propriety of judicial review of the resulting decision. *Cf. Peavler*, 528 N.E.2d at 46 (examining the nature of the conduct, its effect on governmental operations, and the capacity of a court to evaluate the decision).

A consideration of the decision-making process, as well as the factors influencing a particular decision, will often reveal whether that decision is to be viewed as planning or operational. If a particular course of conduct is determined after consideration or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision. These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications, or schedules. *See id.*

■ On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act. Similarly operational are those ad hoc decisions made by an individual or group not charged with the development of plans or policies. These operational acts, which often implement prior planning decisions, are not "discretionary functions" within the meaning of the Tennessee Governmental Tort Liability Act. In other words, "the discretionary function exception [will] not apply to a claim that government employees failed to comply with regulations or policies designed to guide their actions in a particular situation." *Aslakson v. United States*, 790 F.2d 688, 692 (8th Cir.1986).

■ Another factor bearing on whether an act should be considered planning or operational is whether the decision is the type properly reviewable by the courts. The discretionary function exception "recognizes that courts are ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision" and therefore allows the government to operate without undue interference by the courts. *See Wainscott v. State*, 642 P.2d 1355, 1356 (Alaska 1982). Put succinctly:

[T]he judiciary confines itself ... to adjudication of facts based on discernible objective standards of law. In the context of tort actions ... these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not [reasonableness] but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.

*Peavler*, 528 N.E.2d at 44–45 (quoting *Blessing v. United States*, 447 F.Supp. 1160, 1170 (E.D.Penn.1978)).

## II.

■ We now turn to an examination of whether the acts by the City of Chattanooga come within the discretionary function exception of the Tennessee Governmental Tort Liability Act. The two acts under consideration are first, the City's decision to change the bus schedule and second, the driver's decision to stop the bus only on 18th Street.

The decision by the City to change the bus route for children utilizing the Pro Re Bona stop was a planning/policy decision of the type intended to be immune from judicial challenge. Scheduling is a prime example of an act which involves a balancing of factors, an assessing of priorities, and an allocation of available resources.

However, here we have a situation where the route schedule delineated the stop only as the "Pro Re Bona Nursery." Therefore, we must consider the character of the second allegedly negligent act, namely the bus driver's decision to stop only at 18th Street.[1] To make this determination, we must examine with particularity the amount of guidance given the driver. When a driver's schedule instructs him only to stop at a particular intersection, and does not specify the precise location at that intersection, should the driver's ultimate decision be viewed as a continuing planning step in the formulation of policy or merely an operational act implementing a prior established policy?

It has long been recognized in this State "[t]hat a peculiar and special obligation [exists between] the driver of a school bus [and] the children entrusted to his care.... [T]his relationship demands a special care proportionate to the age of the child and its ability, or lack of it, to care for itself." *Cartwright v. Graves*, 182 Tenn. 114, 128, 184 S.W.2d 373, 378 (1944). Further, "the zone or area of legal responsibility for care of immature school children extends beyond the mere landing of the child from the bus in a place safe in itself, and includes the known pathway which the child must immediately pursue." *Id.* This policy is codified at T.C.A. § 55–8–151(a)(4) (1988), which provides (with exceptions not applicable here):

> [T]he school bus driver is required to stop such school bus on the right-hand side of such road or highway, and the driver shall cause the bus to remain stationary and the visual stop signs on the bus actuated, until all school children who should be discharged from the bus have been so discharged and until all children whose destination causes them to cross the road or highway at that place have negotiated such crossing.

The driver's manual given Chattanooga Public School bus drivers specifically refers to this statute in its discussion of driving regulations. In addition, the Chattanooga Board of Education policy statement with regard to transportation services specifies that "[a]ll operating procedures should consider the protection and best interest of students."

The foregoing demonstrates that, at the very least, a school bus driver must ascertain which direction a child will travel after departing the bus. It has been suggested that requiring a bus driver to know precisely where all children live would impose an enormous responsibility. However, all that is required is that the driver know which direction children normally go when they get off the bus. Given that the alternative may be a child's death, this is not an undue burden to impose on those entrusted with the safe transportation of our school children.

There being a clear plan and policy of the State of Tennessee and City of Chattanooga to provide safe passage across an immediate street toward a child's destination, we find that a decision left to a school bus driver on where to stop at a particular intersection is an operational act not within the discretionary function exception to governmental immunity. *Cf. Aslakson*, 790 F.2d at 693 ("Where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the [federal discretionary function] exception falls away and the United States will be held responsible for the negligence of its employees").

---

1. The Plaintiffs' theory is that, had the bus stopped on Dodds Avenue, as it had done on prior occasions, then the children would have been protected in crossing Dodds because of the stop signs and warning lights on the bus.

### III.

We must next consider whether the driver's decision to stop only on 18th Street constituted negligence with respect to Danny Bowers. The above discussion indicates that a school bus driver does have a general duty to see that children safely negotiate the known pathway they must immediately pursue. *See also Traylor v. Coburn,* 597 S.W.2d 319, 321 (Tenn.App. 1980) (bus driver has a clear duty to exercise reasonable and ordinary care under the circumstances to a child being transported to and from school). The City argues that because Danny Bowers's mother normally escorted him across Dodds Avenue, at least with respect to Danny, the driver had no duty.

The City relies on *Traylor,* which held that a child who had always been met upon getting off the bus was not a person intended to be protected by section 55–8–151(a)(4). However, there the court noted that the driver, "in order to fulfill her responsibilities to stop traffic while children crossed the street after leaving the bus ... had talked with the children to determine whether or not any of them had to cross the street at each school bus stop." *Traylor,* 597 S.W.2d at 320. In *Traylor,* the child's mother had made other arrangements to provide the child safe passage across the street, arrangements which the bus driver both knew of and observed for approximately five months. The court held that, under these circumstances, the child was not a person intended to be within the protection of the statute.

*Traylor* is distinguishable. Unlike the driver in *Traylor,* the driver here did not ascertain any of the children's immediate known pathways. Having not determined the immediate directions the children were to follow upon departing the bus, the driver failed to fulfill his duty to each of them to provide them safe passage through their immediate known pathway. We emphasize that a school bus driver does not have an absolute duty to assure a child's safe passage across all streets leading to his or her home. We only find that under the circumstances of this case, where it was left to the driver to decide precisely where to stop at the Pro Re Bona Nursery, the driver had a duty to each child to make his determination based on which street(s), at that intersection, the children were required to cross as they proceeded toward their homes.

### IV.

Finally, the City asserts that even if its driver breached a duty to Danny Bowers by failing to ascertain that Danny needed to cross Dodds Avenue, this breach was not the proximate cause of Danny's injuries. Rather, the City claims the proximate cause of the accident was Danny's mother's failure to meet the bus on time, a failure that was due to the changing of the bus schedule.

We agree that changing the schedule was a planning act which, if the sole proximate cause of the accident, would not give rise to liability. However, we find that the schedule change was not the sole proximate cause. The fact that the bus was not utilized to stop traffic for the children crossing Dodds Avenue was a cause in fact of the accident; had the traffic been stopped, Danny would not have been struck, notwithstanding the absence of his mother. Further, that a child might be so struck is a foreseeable consequence of a school bus's failure to assist a child's crossing of an intersection. Therefore, the driver's failure to stop was a legal proximate cause of Danny's injuries.

Under the facts of this case, we conclude that there were two causes in fact involving governmental acts, without both of which the accident would not have happened. One act, the changing of the bus schedule, which caused Danny's mother not to arrive in time to escort him across Dodds Avenue, arose out of a "discretionary function" for purposes of T.C.A. § 29–20–205(1). The other act, the failure to stop the school bus on Dodds Avenue, where the driver could have stopped traffic to let the discharged children cross that street, did not arise from a "discretionary function."

We hold that where two governmental acts are concurrent causes of an injury, one of which arises from a discre-

tionary function, the other of which does not, the exception to the removal of immunity contained in T.C.A. § 29–20–205(1) does not apply.

For the foregoing reasons, the judgment of the Court of Appeals is reversed, and the case is remanded to that Court for consideration of the issues pretermitted in their earlier decision. The costs of this appeal are taxed to the City.

REID, C.J., and O'BRIEN, DAUGHTREY and ANDERSON, JJ., concur.