Terri BRIDGES, Individually and as surviving spouse of Private William Bridges, Dec'd., Plaintiff/Appellant,

v.

CITY OF MEMPHIS and City of Memphis Fire Department, Defendants/Appellees.

Court of Appeals of Tennessee, Western Section, at Jackson.

March 18, 1997.

Application for Permission to Appeal Denied by Supreme Court Sept. 2, 1997.

Todd A. Kaplan, James O. Lockard, Memphis, for Plaintiff/Appellant.

Monice Moore Hagler, City Attorney, Robert L.J. Spence, Jr., Amanda C. Kaiser, Staff Attorneys, Memphis, for Defendant/Appellee.

HIGHERS, Judge.

Plaintiff Terri Bridges, individually and as the surviving spouse of Private William Bridges, appeals the trial court's order dismissing her wrongful death claim against Defendants/Appellees City of Memphis and City of Memphis Fire Department. Although the trial court's order does not give a reason for its dismissal of the Plaintiff's action, the order apparently was based on one of several theories of governmental immunity advanced by the Defendants in support of their motion to dismiss. For the reasons hereinafter stated, we reverse the trial court's order of dismissal and remand for further proceedings.

On April 11, 1994, Private William Bridges, a fire fighter employed by the City of Memphis Fire Department (hereinafter "Fire Department" or "Department"), died while fighting a fire at the Regis Tower Apartments located at 750 Adams Avenue in Memphis, Tennessee. The Plaintiff, Private Bridges' widow, brought this action against the City of Memphis and the Fire Department in which she asserted that the Defendants' negligence was the proximate cause of Private Bridges' death. Specifically, the Plaintiff alleged that Private Bridges' supervisor and other Fire Department employees were guilty of negligence in that they violated certain procedures as set forth in the Fire Department's Operations Manual. According to the complaint, the supervisor's violations included, *inter alia,* failing to activate his personal alert safety system device prior to his entry into a hazardous location; ordering Private Bridges to take the elevator to the fire floor; failing to take the proper equipment to the fire floor; failing to establish, maintain, and engage in effective radio communication; ordering Private Bridges out of the elevator, and failing to return Private Bridges to the lobby or the floor below the fire floor, when it was evident that they were unprepared for the hostile environment on the fire floor; and failing to return Private Bridges to the lobby when his self-contained breathing apparatus experienced problems. In addition, the complaint alleged that the Fire Department bat-

talion commander committed the following procedural violations: failing to establish, maintain, and engage in effective radio communication; failing to immediately take a command position or to announce a command post location; removing himself from his command position and failing to monitor certain radio frequencies by being out of his command post vehicle; interfering with fire-fighting and rescue operations by ordering and/or allowing a heavy stream of water to be directed to the fire floor; failing to cause radio transmissions to be made over the Fire Department radio frequencies concerning the use of heavy stream appliance to attack the fire; and setting up the potential for offensive and defensive attack mode combinations. The complaint further alleged that the division chief violated established procedures by failing to have proper delineation for the various incident command system functions; failing to know the status of fire fighters or fire-fighting operations; and failing to establish, maintain, and engage in effective radio communication. The complaint alleged that Fire Communications Bureau personnel violated established procedures by failing to recognize problems while monitoring radio transmissions; failing to establish, maintain, and engage in effective radio communication; failing to question Private Bridges' radio transmissions; and failing to recognize and respond to transmissions to the Fire Communications Bureau. Finally, the complaint alleged that other Fire Department personnel violated procedures in the Department's Operations Manual in addition to the foregoing violations by failing to dispatch rescue teams to locate Private Bridges after radio communications ceased or became distorted; failing to prepare for entry into the fire building; and directing a heavy stream of water to the fire floor when fire-fighting personnel, including Private Bridges, were still on the floor.

Although the Defendants denied many of these allegations, during the subsequent discovery process, the Defendants made the following admissions:

1) Lt. Michael Mathis[1] [Private Bridges' supervisor] did not have his per-

---

1. Lieutenant Mathis also perished in the fire, as    did two civilians.

sonal alert safety system device activated during the fire incident.

4) Snorkel 02 discharged a heavy stream of water into a 9th floor window at approximately 2:26 a.m. on April 11, 1994.

5) The heavy stream appliance application forced Engine Co. 01 personnel from the hallway of the fire floor, and subsequently impacted interior fire-fighting and rescue operations.

6) Lt. Mathis and the officer of Snorkel 13 took the elevator to the floor of origin which is against all fire-fighting practices.

8) Following standard operational procedure, Lt. Mathis and the officer of Snorkel 13 should have returned to the lobby or to the floor below the fire.

9) Once out of the elevator, all personnel should have immediately left the fire floor by use of the stairwell.

10) The command post did not dispatch rescue teams to locate Engine Co. 07 personnel after radio communications ceased or became distorted.

12) Pvt. William Bridges made four attempts to contact Lt. Mathis by radio.

13) The Fire Communications Bureau was in error by not questioning Pvt. Bridges' radio transmissions on radio frequency 05.

14) The Fire Communications Bureau operator, not having previously dispatched during a second alarm fire, was assigned to this radio position.

15) The Fire Communications Bureau operator was not replaced by a senior operator upon acknowledging the request for second alarm coverage.

16) The supervisor of the Fire Communications Bureau was also present and heard two of Pvt. William Bridges' transmissions.

17) The Fire Communications Bureau operator questioned her supervisor upon hearing the radio calls "7C to 7A" but was advised that 7C was not attempting to reach the Fire Communications Bureau.

19) Pvt. William Bridges arrived on the 9th floor of 750 Adams by way of elevator at approximately 2:11 a.m. on April 11, 1994.

21) Upon exiting the elevator, Pvt. William Bridges experienced difficulty with his self-contained breathing apparatus.

22) Pvt. William Bridges became entangled in cable television wire that had fallen from the ceiling.

23) The cable television wires had originally been secured by a plastic encasement on the walls just below the ceiling.

24) The heat of the fire had melted the encasements, allowing the cable to fall or hang downward in the hallway.

27) Pvt. William Bridges subsequently died as a result of carbon monoxide poisoning and smoke inhalation.

28) When found, Pvt. William Bridges had cable wires wrapped around his self-contained breathing apparatus, his back and legs.

33) Snorkel 13 took only one axe to the fire floor.

34) Later arriving personnel remained on their equipment instead of reporting to their expected staging areas.

36) Upon assuming command, the battalion commander 01 exited his vehicle to watch the fire incident.

37) The battalion commander 01 did not immediately take a command position.

38) The battalion commander 01 did not announce a command post location.

39) The battalion commander removed himself from his command position and did not monitor radio frequencies 04 and 05 by being out of his command post vehicle.

44) No radio transmissions were made, over fire department radio frequencies, concerning the use of heavy stream appliance to attack the fire.

46) The division chief failed to announce, by radio, that a heavy stream water application was to be used on the fire building.

47) Fire fighters as well as residents were still on the fire floor when the heavy stream appliance was initiated.

48) The combination of offensive and defensive modes of fire attack are in violation of the Memphis Fire Department's standard operational procedure.

52) Officer of Engine Co. 05 utilized himself as well as a private to search for a stand-pipe to connect Engine 05.

54) The battalion commander 01 personally gave orders to Snorkel Co. 02 personnel to initiate the heavy stream of water application into the 9th floor window.

The Defendants filed a motion to dismiss the Plaintiff's complaint pursuant to rules 12 and 56 of the Tennessee Rules of Civil Procedure. The trial court granted the motion, and this appeal followed.

In *Fulenwider v. Firefighters Ass'n Local Union 1784,* 649 S.W.2d 268, 269 (Tenn.1982), the Supreme Court of Tennessee recognized "the general rule of law that a city is not liable in a private damage suit to individual citizens for failure to furnish adequate fire or police protection." The Court acknowledged, however, that this general rule might be affected to some extent by the enactment of the Tennessee Governmental Tort Liability Act (GTLA).[2] Inasmuch as the City of Memphis was no longer a party to the action in that case, the Court declined to address the question.

Seven years later, in *Gordon v. City of Henderson,* 766 S.W.2d 784 (Tenn.1989), the Supreme Court was faced squarely with the issue of whether the foregoing general rule of law survived passage of the GTLA. Whereas, prior to passage of the GTLA, a municipality and its fire department generally were immune from such suits, the Court held that the Act removed governmental immunity where the plaintiff's injury was proximately caused by the negligent act or omission of a city employee, unless the injury arose "out of the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused." *Id.* at 786 (quoting T.C.A. § 29–20–205 (1980)).

In *Gordon,* the plaintiffs' complaint alleged that the deaths of four residents were caused by the following negligent acts of fire department personnel: their absence from their regular duty station; their inadequate response time; their apparent intoxication; and their incorrect placement of equipment

in operation. *Id.* at 785. In rejecting the city's contention that the alleged actions were "discretionary," the Supreme Court stated:

It may be on a full development of facts that some of the acts of the firemen logically will be classified as "discretionary functions," but we find it difficult to categorize the apparent intoxication of firemen as a "discretionary function," nor, without an explanation by defendants, the absence of firemen from their duty station and the resultant undue delay in response time.

*Id.* at 786. Thus, after *Gordon,* suits against fire departments for negligence were permitted, provided the plaintiffs properly could allege that their injuries resulted from fire department employees' performance of, or failure to perform, a non-discretionary act.

In a subsequent decision, this court made clear that, under *Gordon,* a plaintiff may not maintain a suit against a municipal fire department based on the general allegation that the department failed "to respond adequately to the fire." *Harper v. City of Milan,* 825 S.W.2d 92, 96 (Tenn.App.1991). Instead, the plaintiff must be able to allege some lack of proficiency on the part of the municipality. In applying *Gordon,* this court explained that:

[N]ot all of the functions exercised by a fire department are removed from the realm of discretionary functions by the holding in *Gordon.* ... Determining the amount and type of equipment to deploy in response to a particular call is [a] discretionary decision whereas, whether firemen should become intoxicated while on duty or whether calls should be answered immediately is not a question of discretion.

*Harper,* 825 S.W.2d at 95. This court concluded that the plaintiffs' general allegation—that damages to their home were greatly enhanced by the city's failure to respond adequately to the fire—did not "raise an issue of fact regarding the proficiency or skill of the firemen." *Id.*

After *Gordon* and *Harper,* the Supreme Court of Tennessee decided *Bowers ex rel. Bowers v. City of Chattanooga,* 826 S.W.2d

**2.** T.C.A. §§ 29–20–101 to 29–20–407 (1980 & Supp.1996).

427 (Tenn.1992). Although not related to the specific issue of a fire department's negligence, the *Bowers* decision was important because it sought to provide courts with "more guidance with respect to which activities are within the scope of the GTLA's 'discretionary function' exception." *Bowers*, 826 S.W.2d at 430. Rejecting as imprecise the traditional classification of functions as governmental-proprietary or discretionary-ministerial, the Court adopted the following planning-operational test:

> Today we approve of the analysis that determines which acts are entitled to immunity by distinguishing those performed at the "planning" level from those performed at the "operational" level....
>
> ....
>
> Under the planning-operational test, decisions that rise to the level of planning or policy-making are considered discretionary acts which do not give rise to tort liability, while decisions that are merely operational are not considered discretionary acts and, therefore, do not give rise to immunity.... The distinction between planning and operational depends on the type of decision rather than merely the identity of the decision maker.... We caution that this distinction serves only to aid in determining when discretionary function immunity applies; discretionary function immunity attaches to all conduct properly involving the balancing of policy considerations. Therefore, there may be occasions where an "operational act" is entitled to immunity, where, for instance, the operational actor is properly charged with balancing policy considerations....
>
> Under the planning-operational test, discretionary function immunity does not automatically attach to all acts involving choice or judgment. Such an analysis recognizes that, to some extent, every act involves discretion. Rather, the underlying policy of governmental immunity is better served by examining (1) the decision-making process and (2) the propriety

of judicial review of the resulting decision....

> A consideration of the decision-making process, as well as the factors influencing a particular decision, will often reveal whether that decision is to be viewed as planning or operational. If a particular course of conduct is determined after consideration or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision. These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications, or schedules....
>
> On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act. Similarly operational are those ad hoc decisions made by an individual or group not charged with the development of plans or policies. These operational acts, which often implement prior planning decisions are not "discretionary functions" within the meaning of the Tennessee Governmental Tort Liability Act. In other words, "the discretionary function exception [will] not apply to a claim that government employees failed to comply with regulations or policies designed to guide their actions in a particular situation." *Aslakson v. United States*, 790 F.2d 688, 692 (8th Cir.1986).

*Id.* at 430–31 (citations omitted).

■ Applying the planning-operational test as set forth in *Bowers*, we conclude that the Plaintiff's complaint contained sufficient allegations of negligence on the part of the Fire Department so as to survive the Defendants' motion to dismiss. In particular, the Plaintiff alleged that Private Bridges' death was proximately caused by the Fire Department's failure to comply with written procedures of the Fire Department as set forth in its Operations Manual. It is undisputed that these procedures were designed to guide the actions of Fire Department personnel in responding to and fighting fires.[3] The alleged

**3.** We recognize that our holding today represents a departure from language found in *Nevill v. City of Tullahoma*, 756 S.W.2d 226, 233 (Tenn.1988), wherein the majority held "it inappropriate to consider a violation of internal police department policies and procedures as constituting

procedural violations included, but were not limited to, employees and supervisors ordering Private Bridges to take the elevator to the fire floor; ordering Private Bridges out of the elevator and failing to return him to the lobby or the floor below the fire floor, given the hostile environment which existed on the fire floor; failing to establish and maintain radio communication; failing to dispatch rescue teams to locate Private Bridges after radio communications ceased or became distorted; directing a heavy stream of water to the fire floor when fire-fighting personnel, including Private Bridges, were still on the floor; failing to immediately establish a command position; failing to remain with the command post vehicle; and employing both offensive and defensive attack modes to fight the fire.

The Defendants insist that all of the alleged actions of their Fire Department's personnel are properly classified as "discretionary" and, for public policy reasons, should not be the subject of judicial review. In *Bowers*, the Supreme Court recognized that certain types of governmental decisions are not amenable to judicial review. The Court stated:

> Another factor bearing on whether an act should be considered planning or operational is whether the decision is the type properly reviewable by the courts. The discretionary function exception "recognizes that courts are ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision" and therefore allows the government to operate without undue interfer-

ence by the courts. *See Wainscott v. State*, 642 P.2d 1355, 1356 (Alaska 1982). *Bowers*, 826 S.W.2d at 431.

■ We reject the Defendants' argument that all of the Fire Department's actions in this case necessarily were discretionary functions which are not reviewable by the courts. While we agree with the Defendants that, for reasons of sound public policy, courts historically have been reluctant to review the actions of municipal fire departments in responding to and fighting fires,[4] in *Gordon v. City of Henderson*, 766 S.W.2d 784 (Tenn. 1989), the Supreme Court of Tennessee made clear that, since passage of the GTLA, a plaintiff may sue a municipal fire department for negligence, provided the plaintiff can allege that its injury was proximately caused by the fire department's performance of, or failure to perform, a non-discretionary (operational) act. Subsequently, in *Harper v. City of Milan*, 825 S.W.2d 92 (Tenn.App.1991), this court explained that, in order to survive a motion for summary judgment, the plaintiff must be able to allege some lack of proficiency on the part of the fire department. Implicit in these holdings is the recognition that at least some of a fire department's actions in responding to a fire are reviewable by the courts.

As the Court noted in *Gordon*, it may well be that a subsequent development of facts in this case will reveal that many of the acts of Fire Department personnel were "discretionary" as opposed to "operational." *Gordon*, 766 S.W.2d at 786.[5] At this point in the proceedings, however, the Plaintiff's complaint contains adequate allegations of non-discretionary, or operational, acts on the part

negligence or negligence per se." We believe, however, that such a departure is required by the Supreme Court's subsequent decisions in *Gordon v. City of Henderson*, 766 S.W.2d 784, 786–87 (Tenn.1989) (holding that, under GTLA, municipal fire department was not immune from liability for its non-discretionary acts), and *Bowers ex rel. Bowers v. City of Chattanooga*, 826 S.W.2d 427, 431 (Tenn.1992) (indicating that GTLA's discretionary function exception will not apply to claim that government employees failed to comply with regulations or policies designed to guide their actions in given situation). Moreover, we note that the Supreme Court since has overruled *Nevill's* primary holding, "that law enforcement personnel are not liable for injuries resulting from an accident between a vehicle being pur-

sued by the police and an innocent third party because, as a matter of law, police 'conduct' in initiating or continuing the high-speed chase is not a proximate cause of the accident." *Haynes v. Hamilton County*, 883 S.W.2d 606, 607 (Tenn. 1994).

4. See, e.g., Irvine v. City of Chattanooga, *101 Tenn. 291, 47 S.W. 419, 420–21 (1898)*.

5. A question also may arise as to whether the alleged procedural violations were the proximate cause of Private Bridges' death. At this point in the proceedings, however, this issue has not been addressed.

of Fire Department personnel to withstand the Defendants' motion to dismiss.

■ In seeking to uphold the trial court's order dismissing the Plaintiff's complaint, the Defendants also raise an issue concerning the applicability of the public duty doctrine and the policemen and firemen's rule to this case. On June 5, 1995, the Supreme Court of Tennessee issued two decisions which held, respectively, that the public duty doctrine and the policemen and firemen's rule had survived passage of the GTLA. *See Ezell v. Cockrell*, 902 S.W.2d 394 (Tenn.1995); *Carson v. Headrick*, 900 S.W.2d 685 (Tenn.1995).[6] The public duty doctrine immunizes public employees, such as police officers and fire fighters, from actions for injuries caused by the employees' breach of a duty owed to the public at large. *Ezell*, 902 S.W.2d at 397. Conversely, the policemen and firemen's rule precludes police officers and fire fighters "from recovering damages for injuries arising out of risks peculiar to their employment." *Carson*, 900 S.W.2d at 687.

■ Initially, we must reject the Defendants' argument that the public duty doctrine precludes the Plaintiff's present action against the Defendants. An exception to the public duty doctrine arises where "a 'special relationship' exists between the plaintiff and the public employee, which gives rise to a 'special duty' that is more particular than the duty owed by the employee to the public at large." *Ezell*, 902 S.W.2d at 401. We conclude that any duty owed by the Defendants to Private Bridges in this case was not merely a duty owed to the public at large. *See Ezell*, 902 S.W.2d at 402 n. 13 (noting that public duty doctrine did not preclude suit brought in *Gordon* on behalf of residents who died in house fire where fire fighters responded to scene and began fighting fire, "but were unable to do so effectively due to negligence and intoxication").

■ The more difficult question presented in this case is whether the policemen and firemen's rule precludes the Plaintiff's cause of action against the Defendants for Private Bridges' death. The policemen and firemen's rule generally has been applied to prevent police officers and fire fighters from suing private citizens for "injuries sustained while encountering risks peculiar to their employment." *Carson*, 900 S.W.2d at 688. The Supreme Court explained the following rationale for the rule:

> [W]e observe that the preservation of organized society requires the presence and protection of police officers. Situations requiring the presence of police, although commonplace and inevitable, are also routinely dangerous. Public policy considerations, as well as societal expectations, militate against allowing police officers to institute tort actions against a citizen for an injury resulting from a risk the officer is trained and hired to confront. Simply stated, societal policies do not support imposition of a duty of reasonable care upon a citizen calling for police assistance.
>
> Rather, public policy is served when citizens are encouraged to summon aid from police, regardless of their negligence, and are assured that the compensation for injuries sustained by police in the line of duty will be borne by the public as a whole. [Citations omitted]. Accordingly, we conclude as a matter of public policy that a citizen owes no duty of reasonable care to police officers responding to that citizen's call for assistance and join the majority of other jurisdictions who have reaffirmed the policemen and firemen's rule on public policy grounds.

*Carson*, 900 S.W.2d at 690. Thus, for public policy reasons, police officers and fire fighters in Tennessee are not permitted to sue members of the public for injuries that arise out of risks peculiar to their employment. *Id.*

---

6. Although the Supreme Court reaffirmed the validity of the public duty doctrine and the policemen and firemen's rule in these cases, we note that the Court has abolished the fellow servant doctrine, which formerly relieved an employer from liability "for any injuries to an employee resulting from the negligence of a fellow worker engaged in common employment," provided there had been "due care in selection and employment of the tortfeasor." *Glass v. City of Chattanooga*, 858 S.W.2d 312, 313 (Tenn.1993).

Apparently, however, the foregoing rule has not been applied in Tennessee to preclude suits by police officers and fire fighters against a governmental entity, and our research has revealed only two jurisdictions which would preclude such suits based on the policemen and firemen's rule. *See McGhee v. State Police Dep't,* 184 Mich.App. 484, 459 N.W.2d 67, 68 (1990); *Martell v. City of Utica,* 184 A.D.2d 1009, 584 N.Y.S.2d 351, 352 (1992). In this regard, we are hesitant to conclude that the policemen and firemen's rule precludes the Plaintiff from bringing the present action against the Defendants. In accordance with the public policy as set forth by the Supreme Court in *Carson,* citizens, regardless of any negligence on their part, should be encouraged to seek help from municipal fire departments when needed, and they should not have to fear subsequent lawsuits by fire fighters seeking compensation for their injuries. Rather, compensation for such injuries should "be borne by the public as a whole." *Carson,* 900 S.W.2d at 690. Allowing the Plaintiff to maintain the present suit against the Defendants would not frustrate either of these objectives. The present suit should not discourage private citizens from reporting fires to their local fire department. Further, inasmuch as the present suit is against a municipality, it appears that any damages awarded ultimately will be distributed among all of the municipality's citizens.[7]

Based on the foregoing analyses, the judgment of the trial court is hereby reversed, and this cause is remanded for further proceedings consistent with this opinion. Costs on appeal are taxed to the Defendants, for which execution may issue if necessary.

FARMER and LILLARD, JJ., concur.

---

**7.** We likewise reject the Defendants' argument that the provisions of Tennessee Code Annotated section 8–36–108 preclude the Plaintiff's suit in this case. Section 8–36–108 provides that, if a member of the Tennessee consolidated retirement system dies as the result of an accident while in the performance of the member's duty, the member's surviving spouse shall receive a state annuity equal to one-half of the member's average final compensation until the spouse dies or remarries, provided the surviving spouse is the member's named beneficiary. T.C.A. § 8–36–108(a) (1993). We find nothing in the language of section 8–36–108 which would preclude the Plaintiff's present lawsuit against the City of Memphis and the Fire Department.