IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
May 8, 2003 Session

**LINDA LAWS, EXECUTRIX OF THE ESTATE OF MARY EULA SLOAT, DECEASED  v. WATER AND LIGHT COMMISSION OF THE TOWN OF GREENEVILLE, ET AL.**

**Appeal from the Circuit Court for Greene County**
**No. 14168     Ben K. Wexler, Judge**

**FILED SEPTEMBER 3, 2003**

**No. E2002-01152-COA-R3-CV**

---

This appeal questions whether the Trial Court erred in its judgment against the Appellant/Defendant, Water and Light Commission of the Town of Greeneville, Tennessee, for personal injuries sustained by a Greeneville resident as a result of the smoking of sewer lines by the Appellant.  We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**; **Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR. and D. MICHAEL SWINEY, joined.

Jeffrey M. Ward, Greeneville, Tennessee, for the Appellant, Water and Light Commission of the Town of Greeneville, Tennessee, et al

J. Ronnie Greer, Greeneville, Tennessee, for the Appellee, Linda Laws, in Her Capacity as Executrix of the Estate of Mary Eula Sloat, Deceased

**OPINION**

The Water and Light Commission of the Town of Greeneville (hereinafter "the Commission") is a government entity in charge of water and sewer services for the Town of Greeneville.  The Commission employs a smoking procedure to detect leaks in the sewer system. This procedure entails the introduction of smoke candles into the system by way of a manhole near the suspected leak.  The smoke from the candle is forced through the system by a blower and Commission employees look for surface locations such as vents or drain pipes where the smoke emits, evidencing a break in the sewer line.

On January 18, 1993, Commission employees dropped two smoke candles into a manhole at the intersection of Chestnut and Cypress Streets. Thereafter, the employees noted smoke coming out of the basement of a house at 301 Cypress Street and notified the owner. Mary Eula Sloat, the executrix of whose estate is the Appellee in this matter, was in her house at 308 Cypress Street at the time. ( For the sake of simplicity the Appellee will hereinafter be referred to as "Ms. Sloat.") Unbeknownst to the Commission employees, smoke also entered Ms. Sloat's home through a hole in the sewer line. Ms. Sloat who suffered from chronic obstructive pulmonary disease was overcome by the smoke. She was later discovered on the floor of her kitchen by a neighbor and was taken to the hospital where she was placed in the intensive care unit and treated for severe respiratory distress. Ms. Sloat was removed from the intensive care unit the next day and was discharged from the hospital on January 23, 1993.

In his testimony, Ms. Sloat's physician described chronic obstructive pulmonary disease as a combination of emphysema and chronic bronchitis and stated that her exposure to the smoke in her home on January 18, 1993, accelerated the progress of the disease and deteriorated the mental and physical quality of her life:

> She was practically housebound. She was rarely able to make an office visit. Her -- she was extremely anxious to the point that, that the low dose of Xanax was quadrupled. She -- her demeanor changed. There were no more jokes and laughing. She was not her usual self anymore. She was a person that I would describe as constantly being afraid, afraid that she would lose her breath at any time.... She deteriorated into a human being who would sit on the couch and hold herself and, and just shake and do constant pursed lip breathing.

On November 23, 1993, Ms. Sloat filed a complaint against the Town of Greeneville asserting that the smoking of the sewers without warning to residents in the area constituted negligence and that she sustained personal injuries as a result of being exposed to the smoke. By agreed order entered January 21, 1994, the complaint was amended to change the defendant to the Water and Light Commission of the Town of Greeneville with such amendment relating back to the time of the filing of the original complaint. Additionally, by amended complaint filed in May of 1996, Ms. Sloat also added Roto-Rooter Sewer Drain Service and Superior Signal Company, the manufacturer of the smoke candles used in smoking the sewer, as defendants in the case.

Ms. Sloat died from chronic obstructive pulmonary disease on January 27, 1997, and an order was entered substituting Linda Laws, executrix of the estate of Mary Eula Sloat as plaintiff in the case.

Ms. Sloat's complaint against Superior Signal Company, Inc. was dismissed upon settlement prior to trial and a voluntary non-suit was taken as to Roto-Rooter Sewer Drain Service.

After trial of the case in March and April of 2002 the Trial Court filed its opinion finding that Ms. Sloat had sustained damages in the amount of $80,000.00 with ninety percent of the fault

attributable to the Commission and ten percent of the fault attributable to Superior Signal Company, Inc. Pursuant to these findings judgment was entered against the Commission in the amount of $72,000.00 and, thereafter, the Commission filed this appeal.

The issues presented for our review are restated as follows:

1. Whether the Commission is immune from liability upon grounds that it was engaged in the negligent inspection of property.

2. Whether the Commission is immune from liability upon grounds that the decision not to warn residents of the sewer smoking procedure is a discretionary function.

3. Whether it was established by a preponderance of evidence that the Commission negligently breached a duty to warn.

4. Whether a warning would have prevented Ms. Sloat's injuries.

5. Whether the Superior Signal Company Inc. should have been assessed with more than ten percent of the fault for Ms. Sloat's injuries.

Our standard of review in this non-jury case is *de novo* upon the record of the proceedings below and there is no presumption of correctness with respect to the Trial Court's conclusions of law. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26 (Tenn. 1996) and T.R.A.P. 13(d). The Trial Court's factual findings are, however, presumed to be correct and we must affirm such findings absent evidence preponderating to the contrary. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87 (Tenn. 1993).

The first issue we address is whether the Commission is immune from liability upon grounds that it was engaged in the inspection of property.

That portion of the Governmental Tort Liability Act embodied at T.C.A. 29-20-205 provides that "[i]mmunity from suit of all governmental entities is removed for injury proximately caused by a negligent act or omission of any employee within the scope of his employment..." However, at subsection (4) the statute excepts this removal of immunity if the injury complained of arises out of " a failure to make an inspection, or by reason of making an inadequate or negligent inspection of any property."

The Commission asserts that any warning that might have been given regarding the smoking of the sewers "would clearly have been given as part of the inspection process and would be an integral part of that process." Thus, the Commission contends that, in asserting that there was a negligent failure to warn her of the smoking of the sewer "Ms. Sloat is essentially claiming that the method of inspecting the sewers was negligent." The Commission argues that "the alleged duty to warn and the inspection are not independent or mutually exclusive events" and that "if not for the inspection of the sewers, Ms. Sloat would not be claiming any need to warn." Accordingly, the

Commission maintains that it should retain its immunity under the exception set forth at subsection (4) of the statute.

The Supreme Court of this state has recognized that the Governmental Tort Liability Act is in derogation of the common law and must, therefore, be strictly construed. *Limbaugh v. Coffee Medical Center*, 59 S.W.3d 73 (Tenn. 2001). The exception to the removal of immunity set forth at subsection (4) relates to the failure to make an inspection or the making of an inadequate inspection. Webster's New World Dictionary (College ed. 1966) defines "inspection" as "careful investigation; critical examination." Given the rule of strict construction applicable in this matter we decline to extend the definition of "inspection" to include the warning of an inspection. "If the words of a statute plainly mean one thing they cannot be given another meaning by judicial construction." *Henry v. White*, 250 S.W.2d 70 (1952). Any warning of inspection, if compelled, would have been compelled by the fact of the inspection; however, it does not follow that such warning would have been an element of the inspection. A warning would have been incidental to, rather than intrinsic to, the inspection. It is our finding that an inspection and a warning of an inspection are independent events and, accordingly, the Commission's argument for retention of immunity under T.C.A. 29-20-205(4) is without merit.

The next issue we address is whether the Commission retains immunity for its failure to warn residents of the sewer smoking procedure upon grounds that the decision of whether to warn is a discretionary function.

T.C.A. 29-20-205(1) provides another exception to the removal of immunity from suit of governmental entities for injuries arising out of "the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused; ..."

In *Bowers v. City of Chattanooga*, 826 S.W.2d 427 (Tenn. 1992) our Supreme Court provides guidance in determining which activities fall within the scope of "discretionary function" by adopting a "planning-operational test." Under this test, policy making or planning decisions are deemed to be discretionary and will not subject a governmental entity to tort liability; however, a governmental entity will be subject to liability for decisions that are merely operational. At page 431 of *Bowers* the Court states as follows:

> Under the planning-operational test, discretionary function immunity does not automatically attach to all acts involving choice or judgment. Such an analysis recognizes that, to some extent, every act involves discretion. Rather, the underlying policy of governmental immunity is better served by examining (1) the decision-making process and (2) the propriety of judicial review of the resulting decision. *Cf. Peavler,* 528 N.E.2d at 46 (examining the nature of the conduct, its effect on governmental operations, and the capacity of a court to evaluate the decision).
>
> A consideration of the decision-making process, as well as the factors

-4-

influencing a particular decision, will often reveal whether that decision is to be viewed as planning or operational. If a particular course of conduct is determined after consideration or debate by an individual or group charged with the formulation of plans or policies, it strongly suggests the result is a planning decision. These decisions often result from assessing priorities; allocating resources; developing policies; or establishing plans, specifications, or schedules. *See id.*

On the other hand, a decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act. Similarly operational are those ad hoc decisions made by an individual or group not charged with the development of plans or policies. These operational acts, which often implement prior planning decisions, are not "discretionary functions" within the meaning of the Tennessee Governmental Tort Liability Act. In other words, "the discretionary function exception [will] not apply to a claim that government employees failed to comply with regulations or policies designed to guide their actions in a particular situation." *Aslakson v. United States,* 790 F.2d 688, 692 (8th Cir.1986).

Another factor bearing on whether an act should be considered planning or operational is whether the decision is the type properly reviewable by the courts. The discretionary function exception "recognizes that courts are ill-equipped to investigate and balance the numerous factors that go into an executive or legislative decision" and therefore allows the government to operate without undue interference by the courts. See *Wainscott v. State,* 642 P.2d 1355, 1356 (Alaska 1982). Put succinctly:

> [T]he judiciary confines itself ... to adjudication of facts based on discernible objective standards of law. In the context of tort actions ... these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not [reasonableness] but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.
> *Peavler,* 528 N.E.2d at 44-45 (quoting *Blessing v. United States,* 447 F.Supp. 1160, 1170 (E.D.Penn.1978)).

In seeking to determine whether the matter now before us involves a discretionary function we specifically note in *Bowers* the Court's recognition of the importance of examining the propriety of judicial review of the decision in question. In particular, we note the above language cited from the *Peavler* case which indicates that judicial review is properly relegated to matters involving objective standards and is not appropriate "when the question is not negligence but social wisdom, not [reasonableness] but economic expediency." However, the questions which arise in the present

case with respect to the Commission's decision not to warn residents of the sewer smoking procedure are not primarily questions of social wisdom and economic expediency but rather questions of negligence and reasonableness which entail an assessment of the risk of injury involved and the feasibility of issuing an effective warning.

The Commission contends that Ms. Sloat's argument is that there should have been a policy of warning residents when the sewer was to be smoked. The Commission asserts that "a decision to have a policy of expending time and resources in sending out warnings to residents within a several block area is a planning decision and not an operational decision." Ms. Sloat disagrees with this categorization and contends that, in fact, years before the incident complained of in this case the Commission had a practice of warning residents when the sewers were smoked. She cites *Bowers, ibid.* for the proposition that a "decision resulting from a determination based on preexisting laws, regulations, policies, or standards, usually indicates that its maker is performing an operational act." Accordingly, Ms. Sloat argues that the Commission's failure to follow its practice of notification on January 18, 1993, was an operational decision.

In *Chase v. City of Memphis*, 971 S.W.2d 380 (Tenn. 1998) the administrator of the estate of the victim of a fatal attack by two pit bull dogs sued the City of Memphis. Several months prior to the attack the pit bulls had mauled a dog belonging to the victim and the City animal shelter had conducted a hearing to determine whether the pit bulls were vicious. It was determined at that hearing that, although the dogs were not vicious, they were dangerous and the shelter issued a letter ordering their owner to correct any fencing deficiencies around the dogs and to enroll the dogs in obedience training school. The letter further provided that, should the order not be complied with, the dogs would be declared vicious and would be seized. Subsequent investigation by the shelter revealed that the owner had not enrolled the dogs in obedience school as ordered. He assured the shelter that he would do so; however, he never did and the animal shelter failed to monitor the matter to insure his compliance. Thereafter, the fatal attack took place.

The record in *Chase* did not show whether the animal shelter had established a procedure for picking up animals designated as dangerous that had been released contingent upon their owner's compliance with an order issued by the shelter. The Court noted that the government tort liability act would have provided immunity had the shelter followed an established policy of picking up animals upon violations of its orders. However, as noted by the Court at page 384 of its opinion:

> A negligent act or omission is operational in nature and not subject to immunity when the act or omission occurs: (1) in the absence of a formulated policy guiding the conduct or omission; or (2) when the conduct deviates from an established plan or policy.

The Court found that the shelter's failure to impound the dogs was a negligent act or omission in the absence of a formulated policy and was, therefore, operational in nature. In the case *sub judice* it appears that either there was no formulated policy with respect to warning residents when the sewers were smoked, or, if there was a policy that residents be warned, it was deviated

from on January 18, 1993. In either instance, as dictated by *Chase,* the Commission's failure to warn was operational in nature and not immune under T.C.A. 29-20-205.

The next issue we address is whether there is a preponderance of evidence in this case showing that the Commission had a duty to warn residents that the sewers were to be smoked. The Commission contends that there was no such duty based upon proof that it had been smoking sewers for thirty years prior to the date in question and had never received a complaint of injury. The Commission also noted testimony of the president of the Superior Signal Company to the effect that smoke from testing enters less than one percent of houses tested and noted that Superior Signal had not suggested advance notice to residents. In support of its argument that it had no duty to warn, the Commission relies upon *Basily v. Rain, Inc.*, 29 S.W.3d 879 (Tenn. Ct. App. 2000).

In *Basily* the plaintiff sued the owners and managers of the apartment complex where she lived along with a company retained by the complex to maintain its irrigation system, for injuries she sustained when she tripped over a protruding water sprinkler located on the grounds of the complex. The plaintiff alleged that the irrigation maintenance company had negligently left the sprinkler in a protruding position after winterizing the irrigation system and that the apartment complex had negligently failed to discover this problem. The plaintiff argued that both the apartment complex and the irrigation maintenance company were negligent in failing to issue a warning to residents of the complex that maintenance was to be performed on the irrigation system.

This Court determined, that, under the facts in *Basily,* a warning was not required because neither the irrigation maintenance company nor the apartment complex should have been expected to anticipate that winterizing the system would cause an unreasonable risk of harm. In reaching this determination the Court noted uncontradicted testimony of the president of the irrigation maintenance company that sprinklers like the one over which the plaintiff tripped rarely failed to retract, that he was not aware of anyone ever tripping over a sprinkler head and that there was no standard in the industry which called for the inspection of sprinkler heads after winterization. The Court also noted testimony that the apartment complex was unaware of any reports of anyone having tripped over a sprinkler at the complex. The Court found no evidence "that either party should reasonably have anticipated that winterizing the irrigation system could create an unreasonable risk of harm to persons living in the apartment complex."

The Commission asserts that in the instant case it would have been rare for smoke to enter a residence and there was no proof of a prior injury from exposure to smoke as a result of smoking the sewers for a period of thirty years prior to January of 1993. The Commission contends that these circumstances are analogous to those in *Basily* and that we should find no duty to warn just as we found no such duty in *Basily.* We disagree.

Specifically, the Court in *Basily* held that neither defendant was required to give warning of the winterization of the irrigation system because neither "should have been expected to anticipate that winterizing the irrigation system would create an unreasonable risk of harm." In *Basily,* no proof was presented that the defendants should have been aware that winterizing the irrigation

system could result in the dangerous condition which caused the plaintiff's injuries. In the case now before us; however, testimony of the Commission's own employees constitutes proof of their awareness that smoking the sewers presented a reasonable risk of harm to a resident such as Ms. Sloat. In this regard we reference the following testimony of Kenneth Earl, superintendent of operations for the Commission:

Q. All right. Now prior to January of 1993, you certainly knew, as you already told us, that there was a potential for smoke from the sewer system to be introduced into the dwelling houses, didn't you?

A. Yes, Sir.

Q. And you also knew that if those dwelling houses were inhabited, that there was certainly potential for the inhabitants to breath that smoke. Correct?

A. Well, sure.

Q. All right. Common sense will tell you that, won't it?

A. Yeah.

Q. And you know, as you told me in deposition, that that's especially true -- no, strike that. Let me back up. You also knew that there was a potential danger to human beings from breathing the smoke, didn't you?

A. It's on a cigarette pack.

Q. So you know about the danger of breathing smoke?

A. I'm sorry. That's what it says there. This smoke just like any other smoke is dangerous to breathe, yes, Sir.

Q. All right. And you knew, did you not, prior to January of 1993 that that was especially true for a person who had preexisting respiratory or lung problems?

A. Well, I guess, there again, it's common knowledge, just common sense.

In addition to the testimony of Mr. Earl, James Collins, an employee with the Commission for twenty five years, testified that, on prior occasions, he had witnessed smoke entering houses during the sewer smoking procedure.

As recognized by our Supreme Court in *McClenahan v. Cooley*, 806 S.W.2d 767 (Tenn. 1991), one of the elements which must be established in order to sustain a cause of action for

-8-

common law negligence is what was formerly called proximate cause, and is now denominated causation in fact. *Waste Management v. South Central Bell,* 15 S.W.3d 425 (Tenn. Ct. App. 1997). Noting that, in proving proximate causation, it must be shown that "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence", the Court states as follows at page 775:

> The forseeability requirement is not so strict as to require the tortfeasor to forsee the exact manner in which the injury takes place, provided it is determined that the tortfeasor could foresee, or through the exercise of reasonable diligence should have foreseen, the general manner in which the injury or loss occurred. ... It is sufficient that harm in the abstract could be reasonably foreseen.

The Commission asserts that there had been no reports of injuries prior to the incident in question. Had there been such reports they would, of course, have constituted persuasive evidence that the incident complained of was foreseeable. However, the absence of such reports does not thereby preclude the forseeability of such an incident. The referenced testimony of Commission employees indicates that "harm in the abstract could be reasonably foreseen" in this case.

The next issue we address is whether a warning, if given, would have prevented Ms. Sloat's injuries. The Commission argues that there was no evidence presented at trial as to what would have constituted an adequate warning and, without proving the type of warning that was required, Ms. Sloat cannot prove that the warning would have prompted her to evacuate her residence.

The Commission hypothesizes that a warning could have been issued "that the smoke from the sewer testing was very hazardous to anyone with lung problems and those persons should evacuate their residence and not return for a set period of time." However, the Commission maintains that there was no proof in the record that would have caused it to issue that level of warning. We are compelled to disagree based upon the previously referenced testimony of Mr. Earl wherein he admits that prior to January of 1993 he was aware that smoke could enter houses during the smoking procedure, that there was potential danger to human beings from breathing the smoke and that this was especially true for individuals with preexisting respiratory problems. It is our determination that this knowledge was certainly sufficient to prompt issuance of the warning posed by the Commission.

The Commission also notes the testimony of Mr. Collins to the effect that several years before January of 1993 he had warned residents when the smoking procedure was about to take place by knocking on their doors and telling them that they had a problem if smoke got in the house. The Commission maintains that, even if this warning had been given, Ms. Sloat would not have evacuated her house. The Commission bases this argument on the acknowledgment of her physician that Ms. Sloat admitted to him that, as of January 18,1993, she was still smoking cigarettes "a little bit." We do not agree that the fact that Ms. Sloat was still smoking cigarettes warrants the conclusion that she would not have evacuated her home upon being advised that smoke might enter her home as a result of the sewer smoking procedure. It does not follow from the fact that Ms. Sloat

was willing to inhale cigarette smoke in known quantities and composition in a manner under her absolute control that she would consent to expose herself to smoke of unknown quantity and composition emanating from a sewer system.

The Commission states that the Trial Court made no findings of fact as to "the type of the warning and expressed no opinion as to the warning that allegedly should have been given." In fact the Trial Court states in its opinion of April 5, 2002, as follows:

> This court is of the opinion that the Water and Light Commission of the Town of Greeneville was negligent by smoking this sewer line and failing to warn Ms. Sloat and the other individuals that lived in houses serviced by this sewer line, of the hazards that could be associated with this smoke to persons that lived in houses serviced by this sewer line, and particularly persons that suffered with lung problems or breathing difficulties.

The obvious minimal warning to residents that would have been suggested by the Commission's knowledge as evidenced by the Mr. Earl's testimony was a warning that the sewers were being smoked, that smoke might enter the resident's house and that, if the smoke did enter the house, breathing it could present a danger, especially to person's with respiratory problems. Although Ms. Sloat died without giving testimony in this case we must assume that she would have acted with due care for her own safety absent evidence to the contrary. *Green v. City of Knoxville* 642 S.W.2d 431 (Tenn. Ct. App. 1982) and *Jeffreys v. Louisville & N.R. Co.*, 560 S.W.2d 920 (Tenn. Ct. App. 1977). Given Ms. Sloat's medical condition, it is our determination that, had she been given the minimal warning called for under the circumstances, exercise of due care would have dictated that she evacuate her house and, in so doing, she would have avoided the injury which she incurred.

The final issue we address relates to the apportionment of damages in this matter. The Commission contends that the Trial Court erred in apportioning ninety percent of damages to the Commission and only ten percent to Superior Signal Company. The Commission argues that this apportionment should be reversed with ninety percent of damages being apportioned to Superior Signal and ten percent to the Commission based upon the "superior knowledge" possessed by Superior. In support of this argument the Commission asserts that, while it had received no complaints of injury due to smoke inhalation in connection with the smoking of sewers, Superior Signal had received complaints in that regard. The Commission also notes that Superior Signal had prepared the following proposed warning as part of a brochure it had designed but that the warning which was not enclosed with the smoke candles used by the Commission:

> To Whom It May Concern:
>
> Please be informed that the Sewer Operating Committee will be testing lines in this area on (insert date) by the use of smoke. The smoke should not enter your home unless a leak is present.

The presence of smoke in your house should be reported immediately to the men conducting the tests, or by calling (insert telephone number).

Avoid unnecessary exposure to the smoke. The smoke is relatively harmless but may be irritating to nasal passages. However, any smoke irritation will be temporary and should quickly disappear after exposure has ceased.

Although the Commission was not provided with the proposed warning set forth above the record shows that each smoke candle carried the following label:

Handle with care. Do not use near flammables. After ignition, place in pail or container. All smoke, including Superior, can initiate breathing damage without respiratory protection.

Even though the Commission was evidently unaware of prior injuries attributable to the smoke, it admittedly knew that the smoke posed a potential danger, particularly to individuals with respiratory problems. The fact that Superior had received actual reports of smoke related injuries is insufficient to support a reapportionment of damages given the knowledge possessed by the Commission and the additional fact that the Commission was in a much better position to warn Ms. Sloat and other residents in the area of the relevant danger. The trier of fact is accorded a great deal of leeway in its allocation of fault. *Wright v. City of Knoxville*, 898 S.W.2d 177 (Tenn. 1995). Our review of the record does not convince us that the evidence preponderates against the Trial Court's determination with respect to the apportionment of damages between the Commission and Superior.

For the foregoing reasons the judgment of the Trial Court is affirmed and the case is remanded for collection of the judgment and costs below. Costs of appeal are adjudged against the Water and Light Commission of the Town of Greeneville.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE