IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 11, 2022 Session

**STATE OF TENNESSEE v. TONY DALE CRASS**

**Appeal from the Circuit Court for Williamson County**
**No. W-CR190604   Joseph A. Woodruff, Judge**

_____

**No. M2021-00528-CCA-R3-CD**

_____

The Williamson County Grand Jury indicted Tony Dale Crass, Defendant, with driving under the influence (DUI), DUI per se, and possession of a firearm while under the influence.  Defendant moved to suppress the evidence, arguing that the State did not have probable cause or reasonable suspicion for the traffic stop and that video evidence of Defendant's driving was erased and deleted as a result of a malfunctioning recording system in Tennessee Highway Patrol (THP) Trooper Joey Story's patrol car.  The trial court concluded that the loss of video evidence constituted a violation of the State's duty to preserve potentially exculpatory evidence recognized in *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999), and deprived Defendant of the right to a fair trial.  The trial court granted the motion to suppress and dismissed the indictment, and the State appealed.  We conclude that the video was not lost or destroyed by the State, (2) that a *Ferguson* violation is not applicable to a suppression hearing based on reasonable suspicion or probable cause for a traffic stop, (3) that the trial court misapplied the "degree of negligence" *Ferguson* factor by equating perceived public policy decisions on the part of the State to negligence, and (4) that Defendant's right to a fair trial can be protected without dismissal of the indictment. We reverse the judgment of the trial court, reinstate the indictment, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;**
**Case Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Kim R. Helper, District Attorney General; and Jamie Pulido, Assistant District Attorney General, for the appellant, State of Tennessee.

Patrick T. McNally and Joseph W. Fuson, Nashville, Tennessee, for the appellee, Tony Dale Crass.

**OPINION**

a. <u>November 6, 2020 Suppression Hearing</u>

On January 3, 2019, THP Trooper Joey Story was returning to his home in Rutherford County after working security at the Governor's residence. While he was traveling behind a white pickup truck on Highway 96 in Williamson County, he observed the truck cross over the right shoulder line of the road ("the fog line"). Trooper Story's patrol car was equipped with a Mobile Video System ("the MVS") that continuously records and deletes until the system is activated, at which time the system preserves what is being recorded and what had been recorded during the thirty seconds prior to activation. Trooper Story could manually activate the MVS to begin audio and video recording by pushing a button on his belt or by pushing a button on the camera, or the system would automatically begin recording when the vehicle's emergency lights were activated. Trooper Story testified that he pressed the button on his belt to wirelessly activate the MVS within thirty seconds of the truck's crossing the fog line. Trooper Story continued to follow the truck. He said that the truck crossed the fog line at least three more times before the driver turned right into a driveway and shut off the truck's lights. Trooper Story testified:

> I watched him turn into the driveway. And it may have been a delayed reaction of why that I didn't turn right in, but I was watching him and then got almost pass (sic) the driveway before I initiated my lights.[1] And then when I did I come back (sic) and made the U-turn and come back (sic). I watched him turn into the driveway. I watched him pull to the edge of the driveway, shut his -- shut the lights off of the vehicle.

Trooper Story turned around and proceeded back to where Defendant was parked. As he approached the driveway, Trooper Story activated his emergency lights and pulled

---

[1] The video recording from Trooper Story's vehicle was entered as Exhibit 1 at the November 6, 2020 hearing. The video begins at 22:14:15 and shows Trooper Story's vehicle traveling on Highway 96. At 22:14:23, Trooper Story begins to turn around, and at 22:14:36, he begins driving back toward Defendant's location. At 22:14:45, he activates his emergency lights and blue light first becomes visible outside Trooper Story's patrol car. At 22:14:47, Trooper Story turns into the driveway behind Defendant's truck. Thirty seconds of video beginning at 22:14:15 were preserved when Trooper Story activated his emergency lights at 22:14:45. The thirty seconds of preserved video does not show Defendant's driving or Defendant's pulling into the driveway.

- 2 -

in behind the truck. When asked by defense counsel why he did not follow Defendant when Defendant turned into the driveway, Trooper Story said that he "couldn't tell you why [he] passed it."

After pulling in behind Defendant, Trooper Story contacted dispatch and asked that another trooper be sent to the scene to handle the investigation, explaining that he did not want to handle a case in Williamson County. Trooper David Green came to the scene and completed the DUI investigation. On the audio recording at the scene, Trooper Story can be heard telling Trooper Green that Defendant "crossed the fog line and I mean he liked to have hit that low shoulder." After completing the investigation at the scene, Trooper Green transported Defendant from the scene and prepared the affidavit of complaint, which stated in pertinent part: "On January 3, 2019, at approximately 10:17 p[.]m[.], THP Trooper Story observed a vehicle fail to maintain its lane of travel near the 4400 block of Hwy 96."

Although Trooper Story thought that the MVS began recording when he pressed the button on his belt, the camera did not activate and continued deleting the thirty seconds of rolling video. Trooper Story explained that, "[o]nce [he] attempted to start it, which is a simple push of the button, it should have started. It was a malfunction in the unit, hence one reason why [they] changed camera systems."

During cross-examination, Trooper Story explained that his main focus was on Defendant's driving habits and that he was not watching the head unit to see if it came on. He stated that: "I thought that the unit c[a]me on. It's never really give[n] me a problem in the past." The following dialogue concerns Trooper Story's failure to mention that he manually tried to activate the MVS when asked during the preliminary hearing if he had dashcam video of Defendant's driving:

> Q. At the time you said that you didn't manually start your video?
>
> A. No, I didn't manually -- with the evidence that was presented by watching the video, I didn't start the video.
>
> Q. But you didn't even make any mention -- you didn't say anything about well I tried to start it or thought it was going -- you know, I had the belt, I could hit the button -- you didn't mention any of that.
>
> A. Well, you didn't ask that. You asked did I manually start it. And it was actually I did not start it.

The trial court also questioned Trooper Story about when he became aware of the fact that the video did not activate when he pressed the button on his belt. Trooper Story

- 3 -

agreed that it was "quite some time" before he actually watched the video, and he stated that he did not remember "whether it has been [his] interaction with the State when [the prosecutor] brought up actually that [they] were going to have the initial hearing." He added that because he did not make the arrest, he "never looked back . . . on it" and "just tagged it" so that Trooper Green could access it.

After Trooper Story testified that Defendant crossed the fog line at least four times, he was asked if he remembered telling Defendant that he pulled him over "because he crossed the line one time." Trooper Story answered, "I don't remember -- I just make reference to crossing the line and about the shoulder. I don't recall the – how many times I said that he crossed the line[.]" When questioned about the affidavit of complaint prepared by Trooper Green that stated that Defendant failed to maintain his lane of travel near the 4400 block, Trooper Story said that he had not looked at or read the affidavit of complaint and did not know why the affidavit of complaint stated that.

Near the end of the first hearing, Defendant moved to amend his motion to suppress to raise "the evidence preservation issue." Defendant argued that he did not know "until Trooper Story's testimony today" that Trooper Story had attempted to activate the video recording system by pressing the button on his belt. In granting Defendant's request to amend his motion to suppress to raise a *Ferguson* violation, the trial court reasoned:

> So[,] I think that there is a negligent failure to preserve the evidence, but it is not Trooper Story's negligence. It's the failure of the Department of Safety to provide reliable equipment that turns on when it is supposed to when the trooper who as he said is paying attention to the driving habits of the vehicle in front of him, paying attention to other things that are going on around him, trying to operate his own vehicle safely. He does what he's trained to do, he hits the button on his belt to turn it on and it doesn't turn on.

The trial court continued the hearing. Defendant filed an amended motion to suppress adding as grounds that the State failed to preserve the video evidence.

### b. April 9, 2021 Hearing

At the subsequent hearing, Trooper Story again said that he pushed the button on his belt to activate the video "within [thirty] seconds of witnessing the [first] lane infraction." Trooper Story agreed that, if the recording system had functioned properly when he pressed the button on his belt, it would have captured and saved video showing

Defendant's driving. When asked if he knew why the video did not record, Trooper Story explained, "Best likelihood is the old and dated equipment that we had."

During cross-examination, Trooper Story agreed that he was familiar with the Tennessee Department of Safety and Homeland Security ("TDS") "General Order" concerning MVS, a copy of which was then entered as Exhibit 2. Trooper Story agreed that he was a commissioned member ("Member") subject to provisions of the General Order.

The stated purpose of the General Order was to "establish policy and procedures . . . concerning the use and control of in-car cameras, also known as 'MVS.'" The General Order stated that "the use of the MVS is intended to substantiate probable cause, enhance criminal prosecutions, limit civil liabilities, protect Members from unwarranted citizen complaints, and document officer contacts." The stated policy of the General Order was "to require Members assigned audio/video recording equipment to utilize the equipment for the purpose of collecting accurate accounts of events as they occur." The failure of a Member to utilize the MVS "in accordance with the provisions of the policy could result in disciplinary action."

The General Order further stated,

> The Director of the Logistics Division . . . [is] responsible for overseeing the installation, implementation, and maintenance of the MVS . . . in such a manner as to automatically begin audio and video recording when the vehicle's emergency lights, siren, air horn, PA system are activated, or when the vehicles speed exceeds 90 mph. The MVS shall also be capable of being activated manually by the wireless transmitter.

Trooper Story was questioned about the "Operational Procedure and Member Responsibilities" section of the General Order, which stated that prior to each shift, Members were required to inspect the MVS and to perform a seven-step inspection of the MVS "to ensure system integrity." After the test, Members were to play back the audio and video recorded during the test to verify proper operation. The seventh step stated:

> (7) Prior to the beginning of each shift, Members are to turn the audio and video on and give a test count from 1 to 5, state rank, name, unit number, date and shift. Members should then play it back to verify proper operation. This procedure can be performed by standing in front of the vehicle or, in the event of inclement weather, from inside the patrol unit.

Defense counsel asked Trooper Story if "he ma[d]e sure the video transmitter was actually working properly." Trooper Story answered that the "red light was on when [he] made contact" with Defendant and that he had good reception. When defense counsel asked whether Trooper Story tested the MVS prior to his shift by pushing the button on his belt, Trooper Story interrupted, stating, "That is not part of the check." Trooper Story did not explain how the audio and video test could be performed when standing outside the patrol unit without using the wireless transmitter on his belt.

According to the General Order, a Member must report "[a]ny malfunction, damage[,] or deviation in operating conditions of the recording equipment . . . to his/her immediate supervisor or available District on-duty supervisor and Dispatcher immediately." Trooper Story testified that he did not report the malfunction to his immediate supervisor or anyone else at the time of the stop because he "didn't know there was a malfunction . . . [or] review the video until there was a set for suppression." He also said that he did not report the malfunction when he later discovered that the video of Defendant's driving was not preserved.

When questioned about the location of his vehicle behind Defendant's truck, Trooper Story said that he "was not very far back" when Defendant turned into the driveway. He said that he was watching Defendant and went past the driveway. He said, "By this time I was almost right at the driveway . . . [and] I activated my lights [and] had to actually turn around in the road and then come back."[2] Defense counsel asked, "So if you hit your blue lights at about the driveway, we should be backing up [thirty] seconds back from that, which [would] have you following him on the roadway three or four car lengths, correct?" Trooper Story answered, "Possible." He explained, "Wherever I activated my lights it should have [gone] back [thirty] seconds." Trooper Story said that it did not appear that the video backed up thirty seconds before he activated his emergency lights.

The trial court took the matter under advisement and, on April 21, 2021, issued its Memorandum and Order finding that potentially exculpatory evidence was erased and deleted as a result of an obsolete recording system installed in Trooper Story's patrol car by TDS. The court found that Trooper Story "was without fault" and that "nothing he did

---

[2] Based on the dashcam video that was entered as Exhibit 1, Trooper Story activated his emergency lights after passing the driveway, turning around, and proceeding back to Defendant's location. The thirty seconds of video recorded prior to activation was preserved, but that thirty seconds of video did not show Defendant's truck.

or did not do caused or contributed to the destruction of the video evidence." Based on Trooper Story's testimony, the court found "that the unreliability of the obsolete video recording equipment was well-known among his fellow troopers performing patrol duties" and that troopers "like Tr[ooper] Story had no choice but to continue using this unreliable equipment, not knowing from one day to the next whether it would function properly." The court determined that "[t]his state of affairs is a consequence of policy choices" made by TDS. The court stated:

> There is no evidence in the record of this case of an objective standard against which TDS's policy choice not to replace the obsolete video recording equipment can be measured. Therefore, TDS's inaction cannot be found to be negligent. Nevertheless, TDS is charged with the knowledge of its employees in the field, such as Tr[ooper] Story, that the obsolete video recording system was no longer fit for purpose. By leaving the obsolete equipment in the field, TDS was running the risk that relevant evidence could be lost, just as it was in this case.

The court found that the State "had a duty to preserve the recorded evidence," and that the State breached its duty. The court found that evidence was "irretrievably lost," thus depriving Defendant of the "only objective evidence with which to challenge" Trooper Story's testimony, that there was "no substitute for the video recording of [Defendant's] driving which was erased and deleted," and that Defendant has been "unfairly prejudiced as a result."

The trial court reasoned that "[t]he missing video relate[d] only to one issue: whether [Defendant's] driving provided a legitimate reason for Trooper Story to detain him for investigation." The court concluded that "the State ha[d] failed to carry its burden of proof to show by a preponderance of the evidence that its detention of [Defendant] was lawful." The court also concluded that "relevant evidence was destroyed" and that "exclusion of all evidence downstream of the destruction of this relevant, irreplaceable evidence [was] the only viable remedy." The court stated that "[Defendant] ha[d] been denied a fundamentally fair trial."

The trial court granted the motion to suppress the evidence and dismissed the indictment. The State appealed.

**Analysis**

On appeal, the State claims that the trial court erred in finding that *Ferguson* applied at the suppression hearing. Alternatively, the State argues that, if *Ferguson* does apply, (1)

the trial court erred in finding that the State had a duty to preserve the video evidence because the evidence never existed, and (2) that the trial court incorrectly applied the three *Ferguson* factors. Defendant claims that the trial court properly applied *Ferguson*, properly found that the State committed a *Ferguson* violation, and did not abuse its discretion by dismissing the indictment. We determined (1) that video of Defendant's driving was never captured and saved and therefore, the video was not lost or destroyed by the State, (2) that a *Ferguson* violation is not applicable to a suppression hearing based on reasonable suspicion or probable cause for a traffic stop, (3) that the trial court misapplied the "degree of negligence" *Ferguson* factor by equating perceived public policy decisions on the part of the State to negligence, and (4) that Defendant's right to a fair trial can be protected without dismissal of the indictment.

### *Ferguson* **and its Progeny**

In *Arizona v. Youngblood*, the United States Supreme Court held "that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. 51, 58, (1988). In *State v. Ferguson*, the Tennessee Supreme Court "rejected the *Youngblood* analysis in its pure form" and adopted "a balancing approach" to be used to determine if a trial, conducted without the evidence that was lost or destroyed, would be fundamentally fair. *Ferguson*, 2 S.W.3d at 917.

*Ferguson* requires the trial court to first determine whether the State had a duty to preserve the evidence. *Id*. "[T]he State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Merriman*, 410 S.W.3d at 785 (quoting *California v. Trombetta*, 467 U.S. 479, 488, (1984)). To meet this constitutional materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Merriman, 410 S.W.3d at 785* (footnote omitted).

"If the proof demonstrates the existence of a duty to preserve potentially exculpatory evidence, the trial court should next determine if the State breached that duty. If the court finds that the State breached its duty, "the analysis moves to a consideration of several factors which should guide the decision regarding the consequences of the breach." *Ferguson*, 2 S.W.3d at 917. The three factors to be considered and weighed are:

1. The degree of negligence involved;

- 8 -

2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3. The sufficiency of the other evidence used at trial to support the conviction.

*Id.*

After balancing these three factors, the trial court may then impose an appropriate remedy. The court can "craft such orders as may be appropriate to protect the defendant's right to a fair trial." *Id.* If the court determines that a trial conducted without the missing evidence would be fundamentally unfair, the court can dismiss the indictment. If the court determines that a defendant's right to a fair trial can be protected, the court can fashion a lesser remedy such as providing a jury instruction. *Id.*

A trial court's decision concerning the fundamental fairness of a trial conducted without missing evidence presents a constitutional issue that is reviewed *de novo*. *State v. Merriman*, 410 S.W.3d 779, 790 (Tenn. 2013). If following a *de novo* review, an appellate court concludes that "the trial would be fundamentally unfair in the absence of the lost evidence," the appellate court "will apply an abuse of discretion standard to review the appropriateness of the remedy imposed by the trial court." *Id.* at 792. "The decision whether to dismiss an indictment lies within the discretion of the trial court." *State v. Harris*, 33 S.W.3d 767, 769 (Tenn. 2000) (citing *State v. Benn*, 713 S.W.2d 308, 311 (Tenn. 1986)). Consequently, "[a]ppellate courts 'may not interfere with a ruling made within the discretionary powers of the trial court absent clear abuse.'" *Id.* at 769-70 (quoting *State v. Street*, 768 S.W.2d 703, 709 (Tenn. Crim. App. 1988)).

*Ferguson* evaluated the State's failure to preserve evidence that could be favorable to the defendant "in the context of the entire record" introduced at Mr. Ferguson's trial. 2 S.W.3d at 914. The supreme court concluded that Mr. Ferguson received a fundamentally fair trial and affirmed the conviction.

Following the issuance of *Ferguson*, several Tennessee cases have addressed the application of *Ferguson* to pretrial motions to dismiss an indictment. In *Merriman*, the "arresting officer's dashcam video recorded his pursuit and stop of the defendant's vehicle using video recording equipment installed in his patrol vehicle, but the video recording was subsequently lost." *Id.* at 782. At the pretrial hearing, the officer "recounted the pursuit and stop of Ms. Merriman's vehicle and recalled activating the video equipment in his car when he first encountered her vehicle." According to the officer, "the video recording

- 9 -

showed Ms. Merriman's vehicle traveling in his lane of traffic and his pursuit and stop of her vehicle, Ms. Merriman's attempts to complete the field sobriety tests, the officer's recitation of the implied consent law to Ms. Merriman, her refusal to submit to a blood test, and her statement that she had taken "a Valium and hydrocodone." The police department procedure required the arresting officer to review the video and make field notes, a supervisor then removes the hard drive containing the video and delivers it to the patrol division captain who enters it into the evidence log. The arresting officer was never able to locate the video. Following the pretrial hearing, the trial court determined that the State had a duty to preserve the potentially exculpatory video evidence and that the State breached its duty. The trial court then balanced the *Ferguson* factors and concluded that a trial without the lost evidence would be fundamentally unfair. *Id.* at 787. The trial court granted Defendant's motion and dismissed the indictment.

When a *Ferguson* motion is brought pretrial, "the trial court is required to assess the sufficiency of the evidence that the State intends to introduce at trial." *Id.* at 788. The *Merriman* court explained that "[a]lthough one part of that analysis includes a review of the sufficiency of the evidence to convict the defendant, the *Ferguson* inquiry into the adequacy of the [S]tate's evidence is not a vehicle to adjudicate questions of fact involving the general issue of guilt or innocence." *Id.* at 787 (internal quotation omitted). In determining that a defendant could assert a *Ferguson* violation in a pretrial motion to dismiss the indictment, the court noted:

> Due to the nature of *Ferguson's* inquiry, we are unable to enumerate every possible procedural setting in which a *Ferguson* analysis could be conducted prior to trial. We caution, however, that a trial court conducting a *Ferguson* analysis must assess the sufficiency of the State's evidence while being mindful that this assessment is not the equivalent of determining the defendant's guilt or innocence beyond a reasonable doubt. Again, *Ferguson's* inquiry into the sufficiency of the State's evidence provides context to the lost or destroyed evidence, allowing the trial court to weigh the significance of the lost evidence in light of the other evidence and to determine an appropriate remedy, if one is required.

The supreme court noted that "[a] video recording from a patrol vehicle is unique by its very nature. No evidence comparable to this video recording could have been obtained through other means." *Id.* at 792-93. The court explained that "[b]ecause no other secondary or substitute evidence was available, the case was reduced to a credibility contest between the officer or officers and Ms. Merriman had she elected to testify at trial." *Id.* at 794. The court noted that the arresting officer "did not testify as to any indicia of alcohol use, and no test results based on breath or blood analysis were available because

Ms. Merriman's refused to submit to testing under the implied consent law" and concluded "that the video recording became more significant in light of the relative strength of the State's case." *Id.* at 796. After balancing the *Ferguson* factors, the supreme court concluded "that the loss of the video recording under the facts of this case deprived Ms. Merriman of her right to a fair trial." *Id.*

In *State v. Kathy L. Bartlett*, No. M2014-01530-CCA-R3-CD, 2015 WL 4381352, at *1 (Tenn. Crim. App. July 17, 2015), the defendant was stopped after an officer observed her speeding, and she was subsequently indicted for driving under the influence. The officer "viewed the recording in his car immediately after the arrest and then submitted it wirelessly to the police station's server." *Id.* When the officer attempted to retrieve the audio-visual recording depicting the stop, "he was told that it was unavailable." *Id.* The defendant filed a motion to dismiss the indictment based on the loss of the recording, which the trial court granted following a hearing. *Id.* at *1-2. This court, following a *de novo* analysis and balancing of the *Ferguson* factors, reversed the trial court, specifically noting the sufficiency of other evidence that would not have been shown on the video, including Ms. Bartlett's statements to the officer after being placed in the patrol car. *Id.* at *3-4. This court stated:

> Based on the above analysis and our balancing of the *Ferguson* factors, we conclude that appellee can receive a fundamentally fair trial without the missing recording. We surmise that to conclude otherwise would construe *Merriman* as requiring dismissal any time the State, through simple negligence, loses a recording of a stop in which the only witnesses are the arresting officer and the defendant; we conclude that based on the multi-factored analysis espoused in *Merriman*, our supreme court did not intend such a result, and we refuse to adopt such a narrow interpretation of *Merriman*.

*Id.* at *4.

A *Ferguson* violation has also been applied pretrial in a limited manner as the basis to order the suppression of evidence. *State v. Clifford Edward Clark*, No. E2009-01795-CCA-R3-CD, 2011 WL 13165164, at *1 (Tenn. Crim. App. Oct. 24, 2011). In that case, the defendant was "stopped by officers as he was leaving the parking lot of a closed business where the officers had just heard four shots fired." Two rifle scope lens covers were discovered during a *Terry* pat-down search and a rifle case was observed partially covered behind the defendant's seat. A Ruger rifle and a box of rifle rounds with four bullets missing were found inside the rifle case. "Immediately thereafter, the officers discovered that a nearby red light traffic camera had been shot four times." *Id.* The

- 11 -

defendant was charged with vandalism and reckless endangerment for shooting a traffic light camera.

When the State failed to provide the damaged camera and camera housing as part of discovery, the defendant filed a motion to dismiss, or in the alternative, to suppress evidence based on *Ferguson* and the warrantless search of vehicles based on *Arizona v. Gant*, 129 S. Ct. 1710 (2009). *Id.* The trial court suppressed the evidence and dismissed the indictment. This court determined that the officers had a reasonable suspicion that the defendant was currently engaging or had been engaged in illegal activity. Following a *de novo* review, this court concluded that the *Ferguson* factors weighed in favor of the defendant's receiving some remedy for the *Ferguson* violation associated with the damaged camera and its housing. *Id.* at *15. This court reversed the trial court's judgment dismissing the indictment and suppressing the evidence found in the defendant's vehicle and determined that the appropriate *Ferguson* remedy was to suppress the photographic evidence of the camera housing. *Id.*

**Application of *Ferguson* to a Motion to Suppress Based on Reasonable Suspicion for a Traffic Stop**

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides for every defendant the right to a fair trial. *Ferguson*, 2 S.W.3d at 915. The due process principles of the Tennessee Constitution are broader than those enunciated in the United States Constitution. *Id.* at 914 (Tenn. 1999); Tenn. Const. art. I, § 8. The issue in *Ferguson* was whether Mr. Ferguson's *trial*, conducted without the evidence that was lost or destroyed, was fundamentally fair under the due process principles of the Tennessee Constitution. In *Merriman*, the supreme court held that a "defendant could assert a *Ferguson* violation in a pretrial motion to dismiss." *Merriman*, at 779. "When a *Ferguson* motion is brought prior to trial, however, the trial court is required to assess the sufficiency of the evidence that the State intends to introduce at trial." *Id.* at 788.

In this case, Defendant raised a *Ferguson* violation in a pretrial motion to suppress evidence in which he claimed that Trooper Story did not have reasonable suspicion to conduct a traffic stop. When Trooper Story activated his vehicle's emergency lights, Defendant was seized. At the time of the seizure, Trooper Story was required to have specific and articulable facts that Defendant had committed a criminal offense in order for the traffic stop to be constitutionally valid. *State v. Garcia*, 123 S.W.3d 335 (Tenn. 2003). In determining if Trooper Story had reasonable suspicion to seize Defendant, the trial court was limited to the "facts and circumstances within the knowledge" of Trooper Story at the time he activated his blue lights. *State v. Smith*, 484 S.W.3d 393, 400 (Tenn. 2016). This

limitation runs afoul to the requirement in *Merriman* that the trial court in deciding a *Ferguson* violation pretrial "assess the sufficiency of the evidence that the State intends to introduce at trial." *Merriman*, at 778. Therefore, we conclude that a Ferguson violation cannot be asserted in a pretrial motion to suppress evidence based on the lack of reasonable suspicion for a traffic stop.

## Lost or Destroyed Video Evidence

The State argues on appeal that the video recording of Defendant's driving never existed. Defendant argues that video evidence did exist and that it was erased and deleted. The trial court found that thirty seconds of rolling video was constantly saved and then erased unless the MVS was activated. The reason that the MVS was not activated is immaterial to the trial court's finding. It does not matter if the MVS malfunctioned when Trooper Story pressed the button on his belt or if Trooper Story did not push the button to activate the MVS. The result is the same. Video of Defendant's driving was not captured and saved to the MVS and therefore there was no video for the State to lose or destroy. Defendant argues that *Merriman* "involved nearly identical circumstances, in determining that the defendant would be deprived of his right to a fair trial without the evidence as no secondary nontestimonial evidence remain to challenge the validity of the stop." In *Merriman*, the dashcam video was saved to the hard drive, the arresting officer watched video and was able to describe the contents of the video, and the hard drive was removed by the arresting officer's supervisor who turned the hard drive over to the patrol division captain to be logged into evidence. When the arresting officer attempted to retrieve the video, it could not be found. The trial court determined that the video was lost by the police. *Merriman*, 410 S.W.3d at 782. We determine that the fact that the video in *Merriman* was captured and saved to the hard drive, and was subsequently lost, distinguishes *Merriman* from the facts of this case. The evidence preponderates against the trial court's finding that the video was lost or destroyed by the State.

## *Ferguson* Factors

Even if we assumed that the video was captured and saved and subsequently lost or destroyed by the State, that the State had a duty to preserve the video, and that the State breached its duty; we determine that the *Ferguson* factors do not support dismissal of the indictment. The first of the three *Ferguson* factors to consider when determining the consequences of a breach of the duty to preserve evidence is the degree of negligence involved on the part of the State in losing or destroying evidence that it had a duty to preserve. *Ferguson*, 2 S.W.3d at 917.

In *Ferguson,* the supreme court determined that the evidence was destroyed as a result of simple negligence. When the court balanced the simple negligence of the State, together with "the significance of the missing evidence" and "the sufficiency of the convicting evidence," it determined that the defendant received a fundamentally fair trial. *Id.* at 918. In *Merriman*, the supreme court conducted a *de novo* review and determined that the dashcam video was lost as a result of simple negligence of the State. When the court balanced the three *Ferguson* factors, it determined that "the loss of the video recording under the facts of this case deprived Ms. Merriman of her right to a fair trial." 410 S.W.3d at 796.

In the Memorandum and Order filed in this case, the trial court found that Trooper Story was "without fault" and that the loss of the video recording was a "consequence of policy choices" made by the TDS, stating that

> [t]here is no evidence in the record of this case of an objective standard against which TDS's policy choice not to replace the obsolete video recording equipment can be measured. Therefore, TDS's inaction cannot be found to be negligent. Nevertheless, TDS is charged with the knowledge of its employees in the field, such as [Trooper] Story, that the obsolete video recording system was no longer fit for purpose. By leaving the obsolete equipment in the field, TDS was running the risk that relevant evidence could be lost, just as it was in this case.

A footnote to the second sentence of the above quoted paragraph stated:

> *See Bowers by Bowers v. City of Chattanooga*, 826 S.W.2d 427, 431 (Tenn. 1992) ("[T]he judiciary confines itself to adjudication of facts based on discernible objective standards of law. In the context of tort actions . . . these objective standards are notably lacking when the question is not negligence but social wisdom, not due care but political practicability, not [reasonableness] but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.")

The trial court found "that the unreliability of the obsolete video recording equipment was well-known among his fellow troopers performing patrol duties" and that troopers "like Tr[ooper] Story had no choice but to continue using this unreliable equipment, not knowing from one day to the next whether it would function properly."

There is no proof in the record concerning TDS's reasons for not updating Trooper Story's MVS before the date the Defendant was stopped. There is no proof in the record concerning what Trooper Story's fellow troopers knew about the reliability of the MVS. When questioned about the MVS in his patrol car, Trooper Story described the equipment as "old and dated" and said that the reason the MVS did not activate "was a malfunction in the unit, hence one reason why we changed camera systems." He then explained: "But like I said I wasn't watching the head unit, I thought the unit c[a]me on. In all fairness, I thought the unit c[a]me on. It's never really give[n] me a problem in the past." The trial court did not find that TDS or Trooper Story committed simple negligence, committed gross negligence, or acted in bad faith by failing to capture and save the video recording of Defendant's driving. We are unwilling to expand the *Ferguson* "degree of negligence" factor to include decisions based on perceived "social wisdom," assumed "political practicability," or potential economic factors. We conclude that this factor weighs heavily against dismissal of the indictment and outweighs the second and third *Ferguson* factors.

## Fundamentally Fair Trial

A trial court's decision concerning the fundamental fairness of a trial conducted without missing evidence presents a constitutional issue that is reviewed *de novo*. *Merriman*, 410 S.W.3d at 790. Following *de novo* review, we conclude that Defendant's right to a fair trial can be protected without dismissal of the indictment.

## Conclusion

Based upon our review of the record, the arguments of the parties, and the applicable law, we reverse the ruling of the trial court suppressing evidence and dismissing the indictment. We reinstate the indictment and remand for further proceedings consistent with this opinion.

_____
ROBERT L. HOLLOWAY, JR., JUDGE